IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
COAL RIVER MOUNTAIN WATCH, INC.,
and SIERRA CLUB,

      Plaintiffs,

      v.                                 CIVIL ACTION NO. 3:10-cv-833

COAL-MAC, INC., and MINGO LOGAN
COAL COMPANY,

      Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, FOR DECLARATORY AND INJUNCTIVE RELIEF, AND TO SCHEDULE HEARING ON SCOPE OF INJUNCTIVE RELIEF**

INTRODUCTION

This citizen suit under the Federal Water Pollution Control Act (hereinafter, the "CWA" or the "Clean Water Act") and the Surface Mining Control and Reclamation Act ("SMCRA") raises eleven claims for relief, based on Defendants' violations of the effluent limitations in four of their West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") permits. As explained below, Plaintiffs are entitled to Summary Judgment on the question of liability raised by their First and Second Claims for Relief. Plaintiffs are also entitled to declaratory and injunctive relief.

BACKGROUND

      A.      **Legal Framework**

The primary environmental statute at issue in this action is the CWA, 33 U.S.C. § 1251 et seq. That statute prohibits the "discharge of any pollutant by any person" into waters of the

United States except in compliance with the terms of a permit. Id. § 1311(a). One such permit is a National Pollution Discharge Elimination System ("NPDES") Permit issued by the United States Environmental Protection Agency ("EPA") or an authorized state under CWA Section 402. Id. § 1342.

That section authorizes the permitting authority to issue a NPDES permit that allows the discharge of any pollutant on the condition that such discharge will comply with all CWA requirements. Id. § 1342(a). Among the limitations prescribed in NPDES permits are effluent limitations. "Effluent limitations" are "any restriction . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters . . . ." Id. § 1362(11).

EPA has authorized the State of West Virginia to administer a NPDES program to regulate the discharges of pollutants into West Virginia's waters. Permits issued under this program are known as "WV/NPDES" permits. The West Virginia Department of Environmental Protection ("DEP") administers the WV/NPDES program for the State of West Virginia.

CWA Section 505(a) authorizes citizen suits "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter." Id. § 1365(a). For citizen suit purposes, effluent standards or limitations include section 301(a) of the CWA and NPDES permits and their conditions. Id. § 1365(f).

This action also arises under SMCRA, the comprehensive federal statute governing the surface mining of coal. Section 506 of SMCRA prohibits surface coal mining operations without a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or from an approved state regulatory authority. 30 U.S.C. § 1256. West Virginia administers such an approved surface mining regulatory program through the DEP. See 30 C.F.R. § 948.10.

Among the performance standards mandated by SMCRA and the West Virginia Surface Coal Mining and Reclamation Act is that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." 30 C.F.R. §§ 816.42 & 817.42; 38 C.S.R. § 2-14.5.b. Furthermore, the rules promulgated under the State mining law provide that the applicable performance standards are conditions of all surface mining permits. 38 C.S.R. § 2-3.33.c.

Like the CWA, SMCRA includes a citizen suit provision. It authorizes federal court actions to compel compliance with SMCRA against operators "alleged to be in violation of any rule, regulation, order or permit issued pursuant to [SMCRA]." 30 U.S.C. § 1270(a)(1).

### B. Factual and Procedural Background

Defendant Coal-Mac, Inc.'s ("Coal-Mac") unlawful discharges from its Hobet No. 7 Surface Mine and the permits associated with that mine are the subject of Plaintiffs' motion for partial summary judgment. That mine is located in Mingo County, West Virginia. On December 2, 2008, WVDEP reissued WV/NPDES Permit WV1003763 to Coal-Mac to regulate its water pollution discharged from the Hobet No. 7 Surface Mine. Ex. 1 to Ps' S.J. Mot. That permit limits the concentrations of pollutants in Coal-Mac's discharges into the Left Fork of Right Fork of Trace Fork of Pigeon Creek from Outfall 002. Id.

On December 2, 2008, DEP renewed WV/NPDES Permit WV1003763. That renewal incorporated immediately effective selenium limits on Outfall 002. Id. Those limits restrict the selenium concentration in Coal-Mac's effluent to a monthly average concentration of 4.7 µg/l and a daily maximum concentration of 8.2 µg/l. As established by the discharge monitoring reports ("DMRs") that Coal-Mac submitted to DEP, Coal-Mac has accrued at least 440 days of violations of the selenium effluent limitations in WV/NPDES Permit WV1003763 between

December 2, 2008, and March 31, 2010.  Ex. 2 to Ps' Motion for Partial Summary Judgment, App. A.  See also Appendix A to Complaint (Doc. # 1-2).

## STANDARD OF REVIEW

A party is entitled to summary judgment when it establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## ARGUMENT

Plaintiffs are entitled to summary judgment because, as a matter of law, (1) Plaintiffs have standing, (2) Plaintiffs provided the requisite notice, (3) Plaintiffs can establish that Coal-Mac is in continuing violation of the CWA and SMCRA, and (4) the undisputable evidence reveals hundreds of violations of the relevant statutes.

### I. Plaintiffs' Have Standing to Prosecute this Action

Article III of the United States Constitution limits the jurisdiction of federal courts to the resolution of cases and controversies.  To establish Article III standing, a plaintiff must establish (1) injury, (2) traceability, and (3) redressability.  Amer. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 517 (4th Cir. 2003).  An organization has representational standing when (1) at least one of its members would have standing to sue in his or her own right, (2) the organization's purpose is germane to the interests that it seeks to protect, and (3) there is no need for the direct participation of the individual members in the action.  Id.

To establish injury-in-fact, "a plaintiff need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area [are] lessened" by the defendant's activity.  Piney Run Preservation Ass'n v. County Com'rs of Carroll County, MD, 268 F.3d 255, 263 (4th Cir. 2002) (internal quotation marks omitted; modification in Piney Run Preservation Ass'n).  Federal courts have noted that "Congress has identified NPDES

4

violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of water into which a permittee's effluents flow." Student Public Interest Research Group of New Jersey, Inc. v. Georgia-Pacific Corp., 615 F.Supp. 1419, 1424 (D.N.J. 1985). A CWA citizen-plaintiff can establish injury-in-fact by submitting evidence that the defendant has discharged a pollutant in excess of its effluent limitations into a stream used by the plaintiff. Friends of the Earth, Inc. v. Gaston Copper Recycling, Corp., 204 F.3d 149, 157 (4th Cir. 2000).

Such evidence is also sufficient to satisfy the traceability prong. The Fourth Circuit has explained that "a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Id. at 161 (internal quotation marks omitted).

Finally, injunctive relief and civil penalties can redress the injuries caused by violations of effluent limitations. Injunctive relief can prevent future violations and civil penalties can deter the defendant and other polluters from future violations. Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. (Laidlaw), 528 U.S. 167, 174 (2000); Gaston Copper Recycling, 204 F.3d at 162-63.

Plaintiffs have standing to pursue this action through at least two of their members: Cindy Rank and Vivian Stockman. Declarations from those members are attached to Plaintiffs' Motion for Partial Summary Judgment as Exhibits 3 and 4, respectively.

Ms. Rank is a long-time member of the Sierra Club and is the Chair of the West Virginia Highlands Conservancy Mining Committee. Ex. 3 at 1. Ms. Rank describes the "scene upstream from Scarlet[, WV,] along Trace Fork" of Pigeon Creek as "lovely, especially the bit of waterfall near the houses at the end of the paved road." Id. at 4. Ms. Rank further states that she has "delighted in splashing" the cool water of Trace Fork of Pigeon Creek with her hands. Id. Ms.

Rank explains, however, that her "enjoyment of that area is only hampered by the knowledge the discharges upstream are selenium laden and threaten the aquatic life in the area." Id. Ms. Rank intends to return to the community of Scarlet and to Trace Fork of Pigeon Creek in the future.

Ms. Stockman is a long-time member of both the Ohio Valley Environmental Coalition and the West Virginia Highlands Conservancy. Ex. 4 at 1. Ms. Stockman has frequently travelled in the vicinity of Coal-Mac's mining operation regulated by WV/NPDES Permit WV1003763. Id. at 2. With regard to the stream that receives discharge from Outfall 002 of that permit, Ms. Stockman explains that she has "visited the Right Fork of Trace Fork of Pigeon Creek above the town of Scarlet immediately downstream of the discharges from the Coal Mac permits" and that she intends to return to this area in the future. Id. Regarding that stream, Ms. Stockman declares that

> [t]he stream here is small but lovely, very inviting on a summer day. Mint grows along the stream and wildflowers, too. But the water seem strangely and disturbingly devoid of life. When I picked up rocks to look, I saw few critters nestled underneath and I saw no minnows. I am concerned that selenium may be having an effect on the aquatic life in this stream.

Id.

As established by their declarations, Plaintiffs' members experience injuries-in-fact to their recreational and aesthetic interests in Trace Fork of Pigeon Creek. Ms. Rank and Ms. Stockman both describe the scenic beauty of Trace Fork, and lament that their enjoyment of their time along that stream is diminished by their concerns about the effect on aquatic life of selenium discharges from Coal-Mac's upstream mining operation. Both Ms. Rank and Ms. Stockman express reasonable concerns about selenium effects on fish, aquatic life, and waterfowl. Ex. 3 at 11; Ex. 4 at 14. In other words, Ms. Rank and Ms. Stockman are individuals

"for whom the aesthetic and recreational values of the area will be lessened" by Coal-Mac's repeated effluent limit violations. See Piney Run Preservation, Ass'n, 268 F.3d at 263.

Moreover, Ms. Rank's and Ms. Stockman's injuries are fairly traceable to Coal-Mac's selenium discharges from Outfall 002 regulated by WV/NPDES Permit WV1003763. As this Court has repeatedly noted, "the relevant showing for standing is not injury to the environment, but injury to Plaintiffs." Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC, ___ F. Supp. 2d ___, ___, 2010 WL 890972 at *5 (S.D. W. Va. Mar. 10, 2010) (quoting Ohio Valley Environmental Coalition v. Apogee Coal Co., LLC, 3:07-cv-413, Doc. # 67 at 7). Here, Plaintiffs' members curtail their use and their enjoyment of the area is diminished because of their reasonable fears regarding selenium from Coal-Mac's upstream facility. See Hobet, ___ F. Supp. 2d at ___, 2010 WL 890972 at *5. ("Because the discharges of selenium at issue would be reasonable expected to cause Plaintiffs' members to curtail their use of Berry Branch and the Mud River area, thus diminishing Plaintiffs' enjoyment of the area, and because Plaintiffs' fear that selenium discharges may result in harm to themselves and wildlife is reasonable, Plaintiffs have satisfied the traceability requirement for standing."). As the Fourth Circuit has explained, "[i]n order to satisfy the traceability requirement, rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Am. Canoe Ass'n v. Murphy Farms, 326 F.3d 505, 520 (4th Cir. 2003) (citing Gaston Copper, 204 F.3d at 161). Selenium has been designated a toxic pollutant by the EPA. 40 C.F.R. § 401.15, and Coal-Mac is discharging selenium in violation of its water quality based effluent limitations. Consequently, Plaintiffs can satisfy the traceability requirement.

7

Finally, Plaintiffs' members' injuries can be redressed by injunctive relief and civil penalties. Laidlaw, 528 U.S. at 174; Gaston Copper Recycling, 204 F.3d at 162-63. Because their members have standing to bring the claims against Coal-Mac, Plaintiffs have standing as well because the requirements for organizational standing are satisfied. Amer. Canoe Ass'n, 326 F.3d at 517.

## II.     Plaintiffs Complied with the 60-Day Notice Provisions

Before citizens may file a citizen suit under the CWA or SMCRA, they must provide prospective defendants with 60-days notice of their intent to sue. 33 U.S.C. § 1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A). Under the CWA, a copy of that notice must be sent to the violator, its registered agent, the Administrator of the Environmental Protection Agency ("EPA"), the Regional Administrator, and the head of the state permitting authority. 40 C.F.R. § 135.2(a)(1). Under SMCRA, a copy of that notice must be sent to the violator, its registered agent, the Secretary of the Department of Interior, the Director of the Office of Surface Mining, the Regional Director, and the head of the state regulatory authority. 30 C.F.R. § 700.13.

Plaintiffs have satisfied the notice requirements in this case. Appended to Exhibit 2 to Plaintiffs' Motion for Partial Summary Judgment is the 60-day notice on which Plaintiffs rely. Plaintiffs commenced this action more than 60 days after they sent their notice letter to Coal-Mac.

## IV.     Coal-Mac is in Continuing Violation of the CWA and SMCRA

The CWA citizen suit provision provides that any person may commence a civil suit in federal court against any other person "who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ." 33 U.S.C. § 1365(a). SMCRA's citizen suit

8

similarly permits civil actions against persons "alleged to be in violation any rule regulation, order or permit issued pursuant to [SMCRA]." 30 U.S.C. § 1270(a)(2).

In Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation ("Gwaltney"), 484 U.S. 49 (1987), the Supreme Court interpreted the "alleged to be in violation" language of Section 505 of the CWA and held that it authorizes federal district courts to entertain citizen suits when plaintiffs "make a good-faith allegation of continuous or intermittent violation." Id. at 64. On remand, the Fourth Circuit construed Gwaltney to allow a case to proceed so long as the plaintiff ultimately proves the truth of those allegations. Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd ("Gwaltney II"), 844 F.2d 170, 171 (4th Cir. 1988). In other words, Section 505 of the CWA includes, as an element of the claim, the requirement that the plaintiff prove the existence of a continuing violation. Because of the similarity in language, the same is true of SMCRA's citizen suit provision.

There are two ways in which a plaintiff can prove a continuing violation. The Fourth Circuit has explained that:

> [c]itizen-plaintiffs may accomplish this either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

Gwaltney II, 844 F.2d at 171-72. That test is commonly referred to as the Gwaltney II test. See e.g., Amer. Canoe Ass'n v. Murphy Farms, 412 F.3d 536, 539 (4th Cir. 2005).

Here, the second prong of the Gwaltney II test establishes ongoing violations of the selenium limits on Outlet 003 of WV/NPDES Permit WV1003763. Under Gwaltney II, intermittent or sporadic violations constitute ongoing violations until there is no real likelihood of repetition. Gwaltney II, 844 F.2d at 172. The evidence in this case shows a likelihood of

continuing violations. The Fourth Circuit instructed the district court in <u>Gwaltney II</u> that the relevant question is "whether the risk of defendant's continued violation had been completely eradicated" at the time the action commenced. <u>Id.</u> With regard to Coal-Mac, that risk clearly remains.

As established by its DMRs, Coal-Mac violated the selenium limits on Outfall 002 of WV/NPDES Permit WV1003763 at least as recently as March 2010. Ex. 2 to Pls' Motion for Partial Summary Judgment, App. A. Moreover, Coal-Mac recently applied to WVDEP to modify WV/NPDES Permit WV1003763 to include a schedule of compliance for its selenium limits. Ex. 5. By letter dated March 8, 2010, DEP denied that request on the grounds that the selenium limits in the permit were already in effect and, "therefore, the modification sought by this application cannot be granted without violating the anti-backsliding provisions of the federal Clean Water Act and the state Water Pollution Control Act and regulations. <u>Id.</u> Coal-Mac's effort to obtain the suspension of its effective selenium limits demonstrates that it has not implemented measures at its Hobet No. 7 Surface Mine to eradicate its selenium violations. In other words, the risk of continuing violations has not been completely eradicated.

Consequently, the evidence shows conclusively that there is a continuing likelihood of a recurrence of violations. <u>Gwaltney II</u>, 844 F.2d at 171-72. Coal-Mac is successfully treating neither its discharges nor the underlying causes of its selenium problems. Consequently, Coal-Mac continues to violate the CWA under Gwaltney II, and the Court has jurisdiction over this action. See also <u>Amer. Canoe Ass'n</u>, 412 F.3d at 539.

**IV.     Coal-Mac is Liable for Hundreds of Violations of the CWA and SMCRA through March 31, 2010**

Coal-Mac's violations of the selenium limitations on Outfall 002 of WV/NPDES Permit WV1003763 form the basis for Plaintiffs' CWA and SMCRA claims against it. To determine

10

liability for permit violations, "all the court . . . is called upon to do is compare the allowable quantities listed in the permits with the available statistics on actual pollution." Student Pub. Interest Res. Gp. of N.J. v. Monsanto, 600 F.Supp. 1479, 1483 (D.N.J. 1985). Dischargers are strictly liable for their permit violations. E.g., Stoddard v. Western Carolina Regional Sewer Auth., 784 F.2d 1200, 1208 (4th Cir. 1986). Consequently, a violation of the requirements of a NPDES permit is automatically a violation of the Act. See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. (Laidlaw), 528 U.S. 167, 174 (2000).

Coal-Mac's WV/NPDES Permit WV1003763 is attached to Plaintiffs' Motion for Partial Summary Judgment as Exhibit 1. That document is the source of the information in the "Units" and "Limits" columns in Appendix A to Plaintiffs' Complaint (Doc. # 1-2).

In response to public records requests under the West Virginia Freedom of Information Act, DEP provided to Plaintiffs database reports of Coal-Mac's discharge monitoring reports for December 1, 2008, through March 31, 2010. See Ex. 2 to Ps' Motion for Partial Summary Judgment, App. A. DMRs constitute binding admissions and may be used to establish liability. See, e.g., Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1115 n. 8 (4th Cir. 1988).

Coal-Mac's DMRs reveal that it has violated the selenium effluent limits on Outfall 002 in WV/NPDES Permit WV1003763 on at least 29 instances since December 2, 2008. See Ex. 2 to Ps' Motion for Partial Summary Judgment, App. A. See also Appendix A to Complaint (Doc. # 1-2). A violation of an average monthly effluent limitation is a violation of the limit for each and every day of the month that the violation occurred, See, e.g., Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 791 F.2d 304, 313-15 (4th Cir. 1986), vac'd on other grounds, 484 U.S. 49 (1987). Based on that principle, Coal-Mac's DMRs reveal that it has accrued 440 days of violations of the CWA by violating the selenium limitations on Outlet 002 of WV/NPDES

11

WV1003763.  Ex. 2 to Ps' Motion for Partial Summary Judgment, App. A.  See also Appendix A to Complaint (Doc. # 1-2).  Consequently, Coal-Mac has committed hundreds of violations of the terms and conditions of WV/NPDES Permit WV1003763, and Plaintiffs are entitled to summary judgment on liability for their First Claim for Relief and a declaratory judgment that Coal-Mac has violated the CWA in each of the instances identified above.

Likewise, Plaintiffs are entitled to summary judgment on liability related to their SMCRA claim in their Second Claim for Relief.  The performance standards under SMCRA mandate that discharges from mining operations "be made in compliance with all applicable State and Federal water quality laws and regulations and with the effluent limitations for coal mining promulgated by the U.S. Environmental Protection Agency set forth in 40 C.F.R. Part 434."  40 C.F.R. §§ 816.42 & 817.42.  The regulations under the West Virginia Surface Coal Mining and Reclamation Act (the "State Act") prescribe a similar standard.  38 C.S.R. § 2-14.5.b.

Furthermore, Coal-Mac is liable for violations of the terms and conditions of the West Virginia Surface Mining Permit for its Hobet No. 7 Surface Mine—S-5074-92.  By operation of 38 C.S.R. § 2-33.c, that permit incorporates the performance standards prohibiting the violation of effluent limitations and material damage.  As described above, Coal-Mac is violating the performance standards that prohibit violations of effluent limitations.  See 40 C.F.R. §§ 816.42 & 817.42, 38 C.S.R. § 2-14.5.b.  Consequently, Coal-Mac has committed hundreds of violations of the terms and conditions of its surface mining permits S-5074-92.  Accordingly, Plaintiffs are entitled to summary judgment on the issue of liability raised by their Second Claim for Relief and a declaratory judgment that Coal-Mac has violated SMCRA in each of the instances identified above.

**PERMANENT INJUNCTIVE RELIEF**

To obtain a permanent injunction,

> "[A] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

Monsanto Co. v. Geertson Seed Farms, ___ U.S. ___, ___, 2010 WL 2471057 at *11 (2010) (quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).  Accord Christopher Phelps & Assocs., LLC. v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007) (internal quotation marks omitted).  In general, courts should apply "traditional equitable principles" when deciding to grant injunctive relief for violations of the CWA.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982).  However, the Supreme Court specifically stated in Weinberger that a district court should "order that relief it considers necessary to secure prompt compliance with the Act." 456 U.S. at 320.  In Amoco Production Co. v. Village of Gambell, AK, the Court also stated that the district court should focus "on the underlying substantive policy the [statutory] process was designed to effect . . . ."  480 U.S. 531, 544 (1987).

Following this guidance, the court in PIRG v. Top Notch Metal Finishing Co., 26 ERC 2012, 2015 (D.N.J. 1987), stated that an effluent limitation is:

> precisely that part of the [Act] which is foremost concerned with furthering the 'underlying substantive policy' of the environmental law: the preservation of the environment and the protection of mankind and wildlife from harmful chemicals.

Because discharge standards "are at the heart of the Clean Water Act," violations of those standards "directly and critically upset the Act's objective: i.e., 'to restore and maintain the integrity of the chemical, physical, and biological integrity of the Nation's waters,' 33 U.S.C. § 1251(a)."  International Union v. Amerace Corp., Inc., 740 F. Supp. 1072, 1086 (D.N.J. 1990).

13

"[T]he fact that defendant violated its permit by discharging more pollutants than authorized means that the restoration and enhancement of the river's water quality was inhibited and therefore, the objective of the Act was frustrated." PIRG v. Powell Duffryn Terminals, Inc., 720 F. Supp. 1158, 1167 (D.N.J. 1989), aff'd in part and rev'd in part on other grounds, 913 F.2d 64 (3d Cir. 1990). See also Ohio Valley Envtl. Coalition, Inc. v. Hobet Mining, LLC, ___ F. Supp. 2d ___, ___ (S.D. W. Va. 2010).

The Supreme Court has made clear that the Court's discretion with regard to injunctive relief is not boundless. In United States v. Oakland Cannabis Buyers' Co-op., the Court stated that

> a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation. A district court cannot, for example, override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all. Consequently, when a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute, but only the advantages and disadvantages of employing the extraordinary remedy of injunction . . . over the other available methods of enforcement.

532 U.S. 483, 497-98 (2002) (internal quotation marks, citations, and footnotes omitted).

The equities in this case favor an injunction. As shown above, Coal-Mac is discharging selenium—a toxic pollutant—into the Left Fork of Right Fork of Trace Fork of Pigeon Creek in unlawful quantities. EPA recently issued a guidance document targeting selenium discharges from coal mining operations as a leading cause of stream impairment in Appalachia:

> A recent EPA study found that nine out of every 10 streams downstream of surface mining operations exhibit significant impacts to aquatic life. Another federal study found elevated levels of highly toxic and bioaccumulative selenium in streams downstream of

14

>valley fills. These impairments are linked to contamination of surface water supplies and resulting health concerns, as well as widespread impacts to stream life in downstream rivers and streams.

U.S. EPA, "Guidance Summary: Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order," April 1, 2010, p. 2 (footnotes omitted), Pl. Ex. 6. In addition, the violation of an effluent limitation "presents strong evidence of irreparable harm." Public Interest Research Gp. v. Yates Indus., Inc., 757 F. Supp. 438, 454 (D.N.J. 1991). See also Hobet Mining, LLC, ___ F. Supp. 2d at ___. Such environmental injury nearly always requires injunctive relief as a remedy. Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 545 (1987).

Moreover, in a case like this, the balance of harms almost always tips in "favor [of] the issuance of an injunction to protect the environment." Id. That is so even where compliance with the CWA is costly. Sen. Rep. No. 92-414, reprinted in 1972 U.S.C.C.A.N. 3668, 3711 (Congress recognized that "where industries have done nothing, their capacity to comply may be stretched to the limit"); PIRG v. Top Notch Metal Finishing Co., 26 ERC at 2016; PIRG v. CP Chemicals, 26 ERC 2017, 2022 (D.N.J. 1987); United States v. Ciampitti, 583 F. Supp. 483, 499 (D.N.J. 1984) (economic loss to polluters "is far outweighed by the benefit to the community from enjoining of activities adversely affecting the environment"). Finally, protection of the State's aquatic resources is in the public interest. Apogee Coal Co., 555 F. Supp. 2d at 648 (concluding that an injunction compelling a mining operator to treat its noncompliant discharges was in the public interest because "the public will be served by the protection of aquatic resources, as intended by the goals and purpose of the CWA and SCMRA"); Hobet Mining, LLC, ___ F. Supp. 2d at ___.

Under Oakland Cannabis, an injunction is an appropriate remedy for Coal-Mac's violations of federal law. Congress has prioritized the protection of the waters of the United States over the needs of industry. Once a citizen-plaintiff has demonstrated that the defendant is in violation of the law, the party seeking injunctive relief only needs to show that there is some reasonable likelihood of future violations. Outboard Marine Corp., 692 F. Supp. at 822. Here, Coal-Mac's repeated violations and refusal to invest in effective treatment technology demonstrate a reasonable likelihood of future violations. The Court must assure that Defendant complies with the CWA and SMCRA; non-enforcement is not an option. Oakland Cannabis, 532 U.S. at 497-98.

In short, the Court should declare that Coal-Mac is in violation of the CWA and SMCRA and should issue an injunction requiring Coal-Mac to come into compliance with the Clean Water Act as soon as possible. To that end, Plaintiffs request that, if the Court grants their motion for summary judgment, the Court schedule a hearing at its earliest convenience to determine the scope and terms of the injunction. This Court recently is proceeding in a similar manner in Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC, Civ. No. 3:09-cv-1167.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Cross Motion for Summary Judgment and issue appropriate declaratory and injunctive relief.

                Respectfully submitted,

                **/s/ Derek O. Teaney**
                DEREK O. TEANEY (WVSB # 10223)
                JOSEPH M. LOVETT (WVSB # 6926)
                Appalachian Ctr. for the Econ. & the Envt.
                P.O. Box 507
                Lewisburg, WV 24901
                Telephone: (304) 793-9007

Fax: (304) 645-9008  
E-mail: dteaney@appalachian-center.org

17