IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
COAL RIVER MOUNTAIN WATCH, INC.,
and SIERRA CLUB,

        Plaintiffs,

v.
                                 CIVIL ACTION NO. 3:10-cv-00833

COAL-MAC, INC. and
MINGO LOGAN COAL COMPANY,

        Defendants.

**COAL-MAC, INC. AND MINGO LOGAN COAL COMPANY'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND COAL-MAC AND MINGO LOGAN'S CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## I.   INTRODUCTION

Plaintiffs Ohio Valley Environmental Coalition, Inc., et al., have advanced a "citizens' suit" against Coal-Mac, Inc. ("Coal-Mac") and Mingo Logan Coal Company ("Mingo Logan") under the Clean Water Act ("CWA") (33 U.S.C. § 1365(a)) and the Surface Mining Control and Reclamation Act ("SMCRA") (30 U.S.C. § 1270(a)) for alleged violations of the selenium limits in their respective CWA-based National Pollutant Discharge Elimination System ("NPDES") permits. *See* Doc. No. 1 (Complaint filed June 17, 2010). Plaintiffs' citizen suit additionally alleges that Defendants have violated certain Amended Orders relating to selenium discharges issued to them by the West Virginia Department of Environmental Protection ("WVDEP"). *Id.*

{C1902017.1}

Plaintiffs now seek partial summary judgment as to discharges associated with Coal-Mac's NPDES Permit No. WV0068764 and Mingo Logan's NPDES Permit No. WV1004956 (the "Permits"), as well as to Defendants' alleged noncompliance with interim deadlines in Amended Orders No. 5 and 45 (the "Amended Orders") issued by WVDEP pursuant to the Permits.  *See* Doc. No. 26 (Pltfs.' Second Motion for Partial Summary Judgment). However, several factors demonstrate that Plaintiffs are not entitled to summary judgment.

First, there are several significant justiciability and jurisdictional problems with Plaintiffs' claims.  As a preliminary matter, with the state administrative process to determine the validity of the very standards at issue in this case still pending, this matter is simply not ripe for adjudication.  Further, and as a related matter, because there are currently no effective selenium limits in the permits, Plaintiffs' 60-day notice letter does not meet the regulatory requirement of identifying the standard "alleged to have been violated."  Where there is no permit limit, there can be no violation of that limit.  Thus this Court is deprived of jurisdiction in this case due to the faulty 60-day notice.  In addition, Defendants do not have any ongoing violations of their selenium limits as a result of stay orders entered by the West Virginia Environmental Quality Board ("EQB") and the Circuit Court of Kanawha County.

Second, Plaintiffs have failed to meet the threshold required to obtain summary judgment.  Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment when it establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  At this stage in the proceedings, genuine issues of material fact exist regarding whether Plaintiffs have properly asserted standing to bring this action.  Finally, Plaintiffs are not entitled to summary judgment because even if Plaintiffs state a claim or this Court otherwise has jurisdiction, the Court should abstain from ruling pursuant to

the *Burford* doctrine.    Accordingly, this Court should deny Plaintiffs' Motion for Partial Summary Judgment and, pursuant to Rule 56, grant Defendants' Cross-Motion for Summary Judgment.

## II.    BACKGROUND

NPDES permits are required under the CWA for discharges of non-fill pollutants to waters of the United States.  *See* 33 U.S.C. §§ 1311(a) & 1342(a) & (k).  The permits at issue here contain "effluent limits" designed to comply with either the technology-based effluent limitation guidelines at 40 C.F.R. Part 434 developed for the coal industry or with State-developed water quality standards.  *See Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Md.* ("*Piney Run I*"), 268 F.3d 255, 265 (4th Cir. 2001).

Congress originally assigned to the Environmental Protection Agency ("EPA") the authority to issue NPDES permits. 33 U.S.C. § 1342(a)(1).  However, the CWA also enabled any state "desiring to administer its own permit program for discharges into navigable waters within its jurisdiction" to apply to EPA for such authority.  *See* 33 U.S.C. § 1342(b); 40 C.F.R. § 123.21 to 123.30.  Once the EPA approves a state's proposed NPDES program, the EPA suspends its issuance of NPDES permits as to discharges subject to the state program and limits its role to one of oversight.  33 U.S.C. § 1342(c)(1); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007); *EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, n. 39 (only one government shall operate an NPDES program within a state and the legislative history of 33 U.S.C. § 1342(c) reflected a concern that Congress intended that States be given maximum responsibility for the permit system); *Save the Bay, Inc. v. EPA*, 556 F.2d 1282, 1294 (5th Cir. 1977); West *Virginia Highlands Conservancy, Inc. v. Huffman*, 588 F. Supp. 2d 678, 681 (N.D. W.Va. 2009); *Chesapeake Bay Found., Inc. v. Virginia State Water*

*Control Bd.*, 495 F. Supp. 1229, 1232 (E.D. Va. 1980) (explaining that EPA retains a review and oversight function).

West Virginia prepared an NPDES permit program for federal approval in the early 1980s through the West Virginia Water Pollution Control Act (W.Va. Code §§ 22-11-1 to -29) and implementing regulations.  That program included provisions for issuing and challenging the terms and conditions of state-issued NPDES permits and orders in appeals to the EQB.  *See* W. Va. Code §§ 22-11-21; 22B-1-1 to -12 & 22B-4-1 to -4 and §§ 29A-5-1 to -5 (establishing right of appeal to EQB).  EPA approved West Virginia's NPDES program in 1982.  47 Fed. Reg. 363 (May 24, 1982).

### III.   FACTS

Plaintiffs claim that Defendants are "in violation" of NPDES Permit Nos. WV0068764 and WV1004956 as well as Amended Orders No. 5 and 45.  Specifically, Plaintiffs claim that Coal-Mac is "in violation" of the Clean Water Act and the terms and conditions of NPDES Permit No. WV0068764 "as a result of the 14 instances shown in Exhibit 2 to this motion. . . ."  Pltfs.' Second Motion for Partial Summary Judgment, p. 1.  Exhibit 2 lists alleged violations of Coal-Mac's NPDES Permit selenium limits for the period of April 1, 2010 to July 1, 2010.

With respect to NPDES Permit No. WV1004956, Plaintiffs claim that Mingo Logan is "in violation" of the Clean Water Act and the terms and conditions of the Permit "as a result of the 15 instances, shown in Exhibit 5 to this motion. . . ."  Pltfs.' Second Motion for Partial Summary Judgment, p. 2.  Exhibit 5 lists alleged violations of Mingo Logan's NPDES Permit selenium limits for the period of April 1, 2010 to July 1, 2010.  In fact, though, there are no on-going violations of these selenium limits.

Plaintiffs further claim that Defendants are liable for violations of Amended Order No. 5 (Coal-Mac) and Amended Order No. 45 (Mingo Logan), as demonstrated in part by Exhibit 7 of their Motion.  Pltfs.' Second Motion for Partial Summary Judgment, pp. 1-2. Plaintiffs claim that Defendants are in violation of these Amended Orders for failing "to timely commence and complete the construction of selenium treatment facilities" pursuant to the respective Orders.  Pltfs.' Second Motion for Partial Summary Judgment, pp. 1-2.  In fact, though, there are no on-going violations of these Amended Orders.

In 2007, DEP issued Amended Order Nos. 5 and 45.  *See* Pltfs.' Second Motion for Partial Summary Judgment at Exs. 3 and 6.  These Orders established a date of April 5, 2010 by which Coal-Mac and Mingo Logan were to meet effluent limits for selenium.  *Id.*

Both Defendants submitted periodic status reports to WVDEP concerning their compliance with the Amended Orders.  *See* Exhibits 1 (Coal-Mac) and 2 (Mingo Logan).  In December 2009, both Defendants submitted applications to WVDEP to modify the deadlines in Amended Order Nos. 5 and 45.  *See* Exhibit 3 (relevant portions of Coal-Mac's application for Modification No. 12 to Permit WV0068764) & Exhibit 4 (relevant portions of Mingo Logan's application for Modification No. 23 to Permit WV 1004956).  Those applications summarized the compliance efforts to date of the Defendants and proposed a new compliance schedule extending the final compliance date until July 1, 2012.  *See* Exhibit 5 & Exhibit 6.

WVDEP issued draft NPDES permit modifications granting Defendants' extension requests, but was unable to finalize the approved process before the original compliance deadline of April 5, 2010 in Amended Order Nos. 5 and 45.  Accordingly, to ensure that the April 2010 deadline did not take effect before WVDEP processed its extension requests,

Defendants obtained stays of the Amended Orders from both the EQB and the Circuit Court of Kanawha County. *See* Exhibits 7 (EQB stay), 8 & 9 (Circuit Court stays).

   The current selenium limits in the Permits and the Amended Orders are the subject of an appeal to the EQB. *See Mingo Logan Coal Co. v. WVDEP*, Appeal No. 10-13-EQB. The EQB is vested with exclusive authority under the West Virginia Water Pollution Control Act to entertain appeals of NPDES-related orders issued by WVDEP. *See* W.Va. Code § 22-11-21.[1] Pursuant to its authority under W. Va. Code § 22B-1-7(d), the EQB issued a stay order on March 31, 2010 which extended the compliance schedule regarding the effluent limits on selenium relevant to the Permits until: "(i) further order of this Board; or (ii) a final decision by the DEP or other NPDES permit authority is rendered on the Appellants' pending requests to extend the final date for meeting selenium effluent limits in the above-listed NPDES permits." *See* Exhibit 6. That compliance schedule had been implemented in the permit as follows: "Complete installation or construction of the treatment facilities, and achieve compliance with the final selenium effluent limitations" by April 5, 2010. *See* Pltfs.' Second Motion for Partial Summary Judgment at Exs. 3 and 6. The Circuit Court of Kanawha County additionally ordered that Defendants' effluent limitations for selenium be stayed until further order of the Circuit Court or a final decision by WVDEP or other NPDES Permit authority is rendered regarding the effective date of Defendants' effluent limits for selenium. *See* Civil Action No. 10-MISC-144 (Exhibit 7); Civil Action No. 10-MISC-145 (Exhibit 8).[2] Thus, whatever else occurred prior to March 31, 2010,

---

[1] The EQB is empowered under the West Virginia Water Pollution Control Act to hear appeals of permits and orders related to administration of the NPDES program. *See* W.Va. Code § 22-11-21. It is also empowered to stay the terms of permits and orders pending resolution of appeals. W.Va. Code § 22B-1-7(b). The EQB is comprised of five members appointed by the Governor. W.Va. Code § 22B-3-1(b). None of its members may receive, or for two years prior to their appointment have received, a significant portion of their income from any private NPDES permit holder. W.Va. Code § 22B-3-1(c).

[2] Defendants sought modifications with WVDEP extending the compliance deadlines for selenium. While WVDEP had proposed to approve the modifications, it ultimately denied the extension requests to avoid a conflict with EPA.

since that date Defendants have <u>not</u> violated selenium limits in the Permits or in the Amended Orders and cannot until the EQB takes further action.

## IV.   STANDARD OF REVIEW

A party is entitled to summary judgment when it establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To survive a motion for summary judgment, the nonmoving party must offer some "concrete evidence" from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The nonmoving party must satisfy this burden of proof by offering ore than a mere "scintilla of evidence" in support of his or her position.  *Id.* at 252.

## V.   ARGUMENT

Plaintiffs' claims suffer from serious justiciability and jurisdictional flaws that, at a minimum, prevent granting summary judgment in favor of the Plaintiffs.   Defendants first address the justiciability concerns:  ripeness and standing.   Then, Defendants identify two jurisdictional flaws in Plaintiffs claim supporting Defendants' cross-motion for summary judgment.   Defendants then discuss the prudential reasons for this Court to abstain from judgment in this matter pending an ongoing state proceeding on the same subject.   Finally, Defendants address the derivative nature of Plaintiffs' SMCRA claims.

**A.    Because the Permits and Amended Orders Are Subject to an Appeal to the EQB, Plaintiffs' Claims Are Not Ripe for Adjudication.**

The Plaintiffs' claims that Defendants violated their permit limits for selenium are not ripe for review because both the Permits and the Amended Orders are currently subject to an

---

*See* Exhibits 9 & 10 (correspondence between WVDEP and EPA regarding EPA's specific objections to proposed modifications).  Defendants have appealed these denials to the EQB and sought to maintain the previously issued stays.  The previous stays issued by the EQB and the Circuit Court of Kanawha County remain in effect.

appeal to the EQB.  In deciding whether an issue is ripe for judicial review, a court evaluates: "1) the fitness of the issues for judicial decision; and 2) the hardship to the parties of withholding consideration."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).  To determine whether an issue is fit for judicial decision, a court must consider whether the issues to be considered are purely legal ones, whether the action giving rise to the controversy is final, and whether further factual development would allow the court to better decide the issues before it.  *See id.*

Plaintiffs' claims are clearly not fit for judicial decision because the action giving rise to the controversy is not final and the decision on whether Defendants violated the selenium limits in their permits is contingent upon further factual development – mainly, whether the EQB upholds Defendants' Permits and Amended Orders.  In a nearly identical lawsuit that Plaintiffs brought against other permit holders for selenium violations, this Court denied a ripeness challenge invoked by the defendants in that case.  *See Ohio Valley Env't Coalition v. Apogee Coal Co.*, 531 F. Supp. 2d 747, 757-58 (S.D.W.V.  2008).  However, the present case has a key distinction from *Apogee*:  the permits and compliance orders at issue in that case were not subject to the EQB appeal.  *Id.*  Indeed, this Court noted that the permits and orders at issue in *Apogee* were finalized and that "the matters at hand are unlikely to become more clear with time."  *Id.* Here, EQB's decision on the validity of the Permits and the Amended Orders will be dispositive on the issue before the Court.  As the agency's action on the Permits and Amended Orders is not final and the factual development of the EQB appeal decision could dictate whether or not Defendants have operated within their permit limits, this issue is neither fit nor ripe for judicial decision.

To show that delayed review will cause hardship, a litigant must show that it will suffer "adverse effects of a strictly legal kind". *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)).  Here, Plaintiffs would suffer no adverse effects "of a strictly legal kind" from delayed review.  If the EQB does not approve the extended compliance schedule proposed for the selenium limits on Defendants' permits, Plaintiffs will have achieved their policy goal of imposing such limits on the permits, and if Defendants subsequently exceed the permit limits Plaintiffs will have full opportunity at that time to pursue a citizen action for alleged violations of valid permit limits.  Conversely, if the EQB approves the extended compliance schedule, that decision would render Plaintiffs' present action invalid because the selenium limits would not be effective in the permits.  In either case, delayed review of the Plaintiffs' citizen suit in this case would not create adverse effects of strictly legal kind.

### B.       Plaintiffs Have Failed to Sufficiently Establish Standing.

Plaintiffs have failed to establish that they have standing under Article III of the United States Constitution to bring this citizen suit alleging Defendants' Clean Water Act violations.  As noted in their Motion, a plaintiff establishes standing by proving (1) injury, (2) traceability, and (3) redressability.  Pltfs.' Memo in Support of Second Partial Motion for Summary Judgment (Doc. 27-2).  In this instance, Plaintiffs have failed to establish injury-in-fact and redressability.

### 1.       Injury-in-fact

Plaintiffs' declarations do not adequately allege actual use or enjoyment of the relevant waters.  The United States Supreme Court has articulated the injury-in-fact prong as requiring that a Plaintiff member suffer a concrete and particularized, actual or imminent

invasion of a legally protected interest. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 556 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc.* ("*Laidlaw*"), 528 U.S. 167, 183 (2000) (reiterating, in a Clean Water Act case, application of the doctrine to Clean Water Act plaintiffs).  For purposes of the Clean Water Act, plaintiffs must allege actual use or enjoyment of the affected area and that their aesthetic or recreational values have been or will be adversely impacted by the challenged activity. *Laidlaw,* 528 U.S. at 181-83.  In *Laidlaw,* various members of one of the organizations alleged that they lived anywhere from one-half to forty miles from the facility ***and*** that they actually drove by, picnicked, walked along, and swam in the North Tygart River—the waterbody into which the facility at issue was allegedly discharging.

   The Supreme Court in *Laidlaw* echoed the requirement that environmental plaintiffs must allege actual *usage or enjoyment* of the affected area and that their aesthetic or recreational values have been or will be adversely impacted by the challenged activity. *Id.* at 183.  Requiring such use or enjoyment ensures that the individual or organization has a sufficient "injury in fact," *i.e.,* an "invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Piney Run Preservation Ass'n v. County Comm'rs of Carroll County*, 268 F.3d 255, 263 (4th Cir. 2001) (citation omitted). *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000).

   Plaintiffs' Motion includes declarations from four members of Plaintiff organizations:  Cindy Rank, Vivian Stockman, Maria Gunnoe, and Chuck Nelson.  Pltfs.' Second Motion for Partial Summary Judgment at Exhibits 8-11.  These declarations raise the concern that the harm alleged by the members is neither "use" nor "enjoyment."  For example, Ms. Rank states in her declaration that because of her ongoing concerns regarding the impact of coal mining, she often travels through southern West Virginia in order to "view and visit local

streams where I know mining has and is taking place." Pltfs.' Second Motion for Partial Summary Judgment at Ex. 16. Ms. Stockman states in her declaration that while she lives in Roane County, West Virginia, she frequently travels through the coal mining areas of southern West Virginia and observes the streams and rivers. Pltfs.' Second Motion for Partial Summary Judgment at Ex. 17.[3] Ms. Gunnoe states in her declaration that she too frequently travels through the southern coalfields of West Virginia and that she observes the streams and rivers of the area during these trips. Pltfs.' Second Motion for Partial Summary Judgment at Ex. 18. Mr. Nelson states in his declaration that he when he visits his brother-in-law he often travels "to Spruce Fork to look at the stream and assess water quality and look for signs of a problem." Pltfs.' Second Motion for Partial Summary Judgment at Ex. 19.

Plaintiffs' declarations suggest that these members have not alleged *actual* use or enjoyment of the affected area, but rather that each member is a sort of "roving environmental ombudsman seeking to right environmental wrongs wherever [he or she] might find them." *Gaston Copper*, 204 F.3d at 157. Such drive-by visits for the sake of locating affected streams do not provide either Plaintiffs as organizations or their members with standing. *See Mancuso v. Consolidated Edison Co. of New York*, 324 F. Supp. 2d 469, 471 (S.D.N.Y. 2004) (aesthetic

---

[3] Ms. Stockman has become a professional standing witness for Plaintiffs. Including this action, she has offered declarations in at least ten cases involving streams spread across the State. *See OVEC v. U.S. Army Corps of Engineers*, Civ. Action No. 3:06-cv-438 at Doc. 5-2; *OVEC v. U.S. Army Corps of Engineers*, Civ. Action No. 3:05-cv-784 at Docs. 155 & 389-11; *U.S. v. Massey*, Civ. Action No. 2:07-cv-299 at Doc. 26-2; *OVEC v. Apogee Coal Co., LLC*, Civ. Action No. 3:07-cv-413 at Docs. 23-5, 56-3, & 65-2; *OVEC v. Hobet Mining, LLC*, Civ. Action No. 3:08-cv-88 at Doc. 21-13; *OVEC v. U.S. Army Corps of Engineers*, Civ. Action No. 3:08-cv-979 at Doc. 36-15; *OVEC v. Hobet Mining, LLC*, Civ. Action No. 3:09-cv-1167 at Docs. 9-3 & 13-1; *OVEC v. Independence Coal Co., Inc.*, Civ. Action No. 3:10-cv-836 at Doc. 16-8; *Sierra Club v. Elk Run Coal Company, Inc.*, Civ. Action No. 2:10-cv-673 at Doc. 30-4. In an EQB appeal taken by OVEC from earlier orders involving some of the very same permits at issue in this case, she testified that her primary purpose in visiting some mine sites was "to take the press there to bear witness to the impacts of mining." *West Virginia Highlands Conservancy, et al. v. Lisa A. McClung, et al.*, Appeal No. 07-10-EQB, Nov. 15, 2007 Tr., pp. 290, 291 & 294 (Exhibit 11). She is an employee of OVEC and lives in Roane County, where by her own admission, there is no mineable coal. *Id.*, pp. 233 & 294. When asked why she travels to mined areas if it upsets her, she testified: "It's my job to upset myself. It's my job to take the journalists there and that makes me upset. . . ." *Id.*, p. 294. Beyond that, she testified that the mere thought that there was selenium in a stream was the harm she sought to prevent. *Id.*, pp. 291-293.

injury experienced as a result of "using" area for purpose of gathering information to oppose project is byproduct of litigation and does constitute injury-in-fact). Therefore, to further explore the true motivations behind the members' alleged use and enjoyment of the relevant waterbodies, Defendants request that this Court refrain from ruling on Plaintiffs' Motion so that Defendants may have the opportunity to conduct discovery with respect to these members and the specific manner in which they incur the harms they allege. In fact, Defendants intend to promptly serve Plaintiffs with discovery requests regarding these subjects.

These declarations fail to adequately indicate that the Plaintiffs had an interest in the use of the resources allegedly affected by Defendants except for alleging an injury they otherwise had not suffered. Such statements do not support a finding of actual injury. Accordingly, they have not established standing and their Partial Motion for Summary Judgment should be denied.

### 2. Redressability

Plaintiffs' declarations also contain certain statements evincing the fact that some of the harms alleged by Plaintiffs' members are not redressable. For instance, Ms. Stockman states that during her trips along Route 17, when she has stopped at Trace Branch she "wanted to go down to the creek to wade, cool off, and look for critters. But with the steep banks and thick Japanese knotweed and what I knew about the selenium discharges, I just wasn't motivated to struggle down the stream bank for a wade." Pltfs.' Second Motion for Partial Summary Judgment at Ex. 17. However, Ms. Stockman's stated apprehension for wading in the affected waters cannot be redressed by any action addressing Defendants' alleged NPDES violations.[4]

---

[4] Similar to Ms. Stockman's declaration, Ms. Gunnoe's declaration states that if she "knew that the creeks were not polluted" she and her grandson "would also live to be old and wise like my grandparents. I worry that my generation and the next generations will not live to be so old because of the effects of all the pollution." Her declaration also states that "[b]ecause of concern about pollution in the streams from upstream mining, members of

State regulations establish the allowable concentrations of selenium in streams depending on the "designated use" of a stream.  For streams that support "aquatic life," there is an acute standard of 20 ppb and a chronic standard of 5 ppb.  See 47 WVCSR 2, Appendix E, Table 1, Section 8.27 (stream uses under the heading "aquatic life").  However, there are different allowable concentrations to protect "human health."  The "human health" category of use is broken into two sub-uses: water used for consumption and water used for recreational purposes such as swimming or fishing.  For those streams which, "after conventional treatment, are used for human consumption" the allowable concentration is 50 ppb.  See 47 WVCSR 2 Section 6.29 (defining Category A waters) & 47 WVCSR 2, App. E, Table 1, Section 8.27 (establishing standard for Category A waters).  For those streams used for "water contact recreation" such as "swimming [and] fishing," there is no limit on the allowable concentration. *See* 47 WVCSR 2, Section 6.4 (defining Category C waters) & 47 WVCSR 2, App. E, table 1, Section 8.27 (establishing standards for Category B and C waters). [5]

Ms. Stockman's, Ms. Gunnoe's, and Mr. Nelson's declarations each contain statements expressing their concerns that Defendants' alleged selenium discharges will potentially impact their personal health and safety or the health and safety of others.  However, the violations alleged in the DMRs presented by Plaintiffs do not show **any** instances where Defendants' discharges exceed the applicable water quality standard for any uses of streams

---

the community no longer use the creeks in the same ways and will no longer allow their children to use the creeks." Pltfs.' Second Motion for Partial Summary Judgment at Ex. 18.  These generalized statements about generic pollution are an insufficient basis on which to base standing because they are standardless complaints that are not redressable by an action to enforce specific standards.

[5] Tellingly, this standard takes fish consumption into account and does not establish a limit.  *See id.* at n.3 (the criteria for Category C waters "have been calculated to protect human health from toxic effects through fish consumption, unless otherwise noted.").  Yet Mr. Nelson's declaration states that "[t]he kids today cannot play and fish in the streams the way we once did," and that he "now refrain[s] from fishing because I am concerned about water quality.  Even if I did fish I would not be comfortable eating the fish because of all the pollution problems.  I don't think it is safe." Pltfs.' Second Motion for Partial Summary Judgment at Ex. 19.

which the declarants seek to make.  Furthermore, the DMRs cannot show any instances where Defendants' discharges exceeded the standard for contact recreation because no such standard exists.  Therefore, to the extent that Plaintiffs allege any potential harm to humans by virtue of wading or contact, their claims are not redressable and fail to establish standing.

### C.  Plaintiffs' 60-Day Notice is Insufficient to Establish Jurisdiction.

Section 504 of the Clean Water Act limits the circumstances in which a plaintiff may bring a citizen suit in several ways.  Most notably, it requires the plaintiff to provide notice 60 days in advance of filing any suit.  33 U.S.C. § 1365(b)(1).  That notice must identify "the alleged violation," but the details of how such identification must be made and what elements to be included in the notice are expressly left to the Administrator to determine.  33 U.S.C. § 1365(b) ("Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.")  The implementing regulation states that notice

> shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged **to have been violated**, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (emphasis added).  Critically, both the statute and the regulation require that the notice identify an existing, not a future violation.  The statute references "***the*** alleged violation" implying that the violation can be identified and is not simply a hypothetical risk of a violation.  The regulation makes that implication a facial requirement of the regulation with its requirement that the notice identify the standard, limitation, or order "***alleged to have been violated.***"  The use of the past tense in the regulation makes clear that a notice of a potential future violation is insufficient under the regulation and therefore cannot confer jurisdiction.  *See Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989) (requiring strict compliance with the

notice requirement for a citizen enforcement action under the Resource Conservation and Recovery Act).

In fact, a notice of future violations clearly fails to satisfy Section 505 of the CWA because the complaint can only be filed against a defendant "alleged to be in violation" of the Act. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.* ("*Gwaltney*"), 484 U.S. 49, 59 (1987). The *Gwaltney* court made it clear that the words "to be in violation" mean that defendant must be in violation at the time the complaint is filed. Accordingly, a notice that only warns of future violations cannot satisfy Section 505.

Plaintiffs' notice as to the permits at issue in the Second Motion for Summary Judgment does not meet the threshold standard established by the regulation. As discussed above, the selenium limits originally scheduled to become effective for these permits on April 5, 2010 have been stayed. Thus, when Plaintiffs sent their 60-day notice letter there was no effective selenium limit of which Defendants could be in violation. Moreover, even if the limits had become effective as of April 5, 2010, in their notice Plaintiffs do not allege any violations of the purported standard after that date. [6] Thus, all Plaintiffs provided notice of was the unremarkable fact that Defendants' discharges of selenium *prior* to a standard potentially coming into effect at some future date were higher than the potential future standard would allow. Where no violation exists because no standard applies, plaintiffs cannot be permitted to submit anticipatory or place-holder notice letters before a new standard is expected to go in effect or before actual violations of such a new standard actually occur because such a notice cannot meet the regulatory requirements, as this case demonstrates. Plaintiffs' notice did not meet the

---

[6] The exhibits attached to Plaintiffs' Second Motion for Partial Summary Judgment listed exceedances of the purported standard from April 1, 2010 through July 1, 2010 that does not cure this failure. At a minimum this court should reject Plaintiffs' 60-day notice as invalid until Plaintiffs provide new notice to the Defendants identifying exceedances that are alleged to have occurred after the purported standard was in effect.

threshold requirements of identifying an alleged violation or a standard that *had been violated*. This defective notice robs the Court of jurisdiction over Plaintiffs' claims relating to these permits; thus the claims related to these permits should be dismissed.

> **D.      The Court Should Deny the Plaintiffs' Motion and Grant Judgment to Defendants Because the Relevant Effluent Limits have been Stayed by the EQB and the Circuit Court of Kanawha County.**

Defendants are not currently subject to any selenium effluent limits pursuant to the Permits at issue because the effective date of those limits has been stayed by the EQB and the Circuit Court of Kanawha County.   In particular, the EQB Stay Order was entered as part of a federally-approved *state program* which administers the NPDES program in West Virginia.  *See* Fed. Reg. 22,363 (May 24, 1982) (approving West Virginia's NPDES program).   Pursuant to that program, the selenium limits in the Permits were stayed pending an appeal to the EQB – before this case was filed.[7]   The EQB is currently set to hear the appeal in December 2010.

The Clean Water Act provides in § 505 that a citizen may bring suit against any discharger "in violation" of water standards or limitations.   33 U.S.C. § 1365(a).   The Supreme Court has construed the "in violation" language to preclude citizen suits for violations that are "wholly in the past," or which are not "brought to enjoin or otherwise abate an ongoing violation."  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.* ("*Gwaltney*"), 484 U.S. 49, 59 (1987).   The *Gwaltney* Court further stated that its reading of the citizen suit provisions of the CWA "make plain that the interest of the citizen-plaintiff is primarily forward-looking."  *Id.*   The question of whether a violation of the CWA is "ongoing" is determined at the time the complaint is filed.   33 U.S.C. §§ 1311, 1342.   Because the selenium limits have been stayed since March 2010, however, Defendants were neither "in violation" when the action was filed nor are they

---

[7] The judicial review procedures under the West Virginia Water Pollution Control Act authorize the EQB to issue stays during review of permit decisions.   *See* West Virginia Code § 22B-1-7(d).

currently.[8]  The burden is on plaintiffs to prove on-going violations.  *Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.* (*"Gwaltney II"*), 844 F.2d 170, 171-172 (4th Cir. 1988).  Plaintiffs have failed to meet this burden.  Absent evidence of an on-going violation, the Court should not only deny the motion for summary judgment, but grant judgment to Defendants based on the lack of jurisdiction and the Plaintiffs' failure to state a claim for which relief may be granted. *See United States v. GAF Corp.*, 389 F.Supp. 1379, 1381-83 & n. 2 (S.D. Tex. 1975) (finding motion to dismiss under Rule 12(b)(1) and 12(b)(6) grounds "merged" because "the inability of the [EPA] Administrator to find a violation under [CWA section 301(a)] has two consequences: (a) the claim presented is invalid, and (b) there is no subject matter jurisdiction.").

Because the EQB and Circuit Court stays are in place, this Court does not have subject matter jurisdiction over Plaintiffs' claims.  However, should this Court rule that it has jurisdiction, Defendants are nevertheless entitled to judgment as a matter of law regarding any violations that have been alleged to occur during the pendency of the stays granted by the EQB and Kanawha County Circuit Court, as the stays demonstrate that Defendants are not currently subject to any selenium effluent limits pursuant to the relevant NPDES permits.

### E.    This Court Should Abstain From This Action Under the *Burford* Doctrine.

Although this Court may otherwise have jurisdiction of this proceeding, it may in its discretion:

---

[8]  The Amended Orders that Plaintiffs allege Defendants are in violation of impose identical deadlines for compliance with the selenium limits in the relevant Permits.  Section 505(a)(1) of the Clean Water Act allows citizen suits to proceed if they address violations of an "order issued by the Administrator or a State with respect to [effluent] standard[s] or limitation[s]."  The Amended Orders at issue ultimately required Defendants to "[c]omplete installation or construction of the treatment facilities, and *achieve compliance with the final selenium effluent limitations*" by April 5, 2010.  *See* Pltfs.' Second Motion for Partial Summary Judgment at Exs. 3 and 6.  Therefore, the Amended Orders were issued by WVDEP "with respect to [effluent] standard[s] or limitation[s]" for purposes of Section 505(a)(1) of the CWA only to the extent that the Amended Orders required compliance with selenium limits by April 5, 2010.  However, because the compliance deadlines set forth in the Amended Orders are congruent with the selenium limits that have been stayed by the EQB, Defendants are not currently "in violation" of the Amended Orders within the scope of the Clean Water Act.

> "refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest"; for it "is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy."

*Burford v. Sun Oil Co.*, 319 U.S. 315, 317-318 (1943) (internal footnotes omitted).  Under this doctrine, "abstention is appropriate when 'federal adjudication would disrupt an important and complex state regulatory scheme.'"  *Interfaith Comty. Org., Inc. v. PPG Indus. Inc.*, 702 F.Supp.2d 295, ----, 2010 WL 1371783, *11 (D.N.J. Mar. 26, 2010)(*quoting Lac D'Amiante du Quebec, Ltee v. Am. Home Assurance Co.*, 864 F.2d 1033, 1043 (3d Cir. 1998)).  Accordingly:

> A federal court sitting in equity must decline jurisdiction "where the exercise of federal review of the question in the case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern" provided "timely and adequate state court review is available."

*Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-4117 (JAP), 2010 WL 2079749, *7 (D.N.J. May 26, 2010)(*quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)(*quoting Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976))).  Thus, when conducting a *Burford* analysis, a court must first determine whether timely and adequate state review is available, then whether federal review could be disruptive of state efforts to establish coherent policy with respect to a matter of substantial public concern.

In the present case, timely and adequate state administrative and judicial review is certainly available, and the issue of whether and when the Defendants must meet effluent limits for selenium is squarely before the State EQB.[9]  Plaintiffs' claims are reviewable in state court

---

[9] *See. e.g., Raritan Baykeeper*, 2010 WL 2079749 at *7 ("Timely and adequate state-court review of an issue may be available even where the statute a plaintiff has sued under vests exclusive jurisdiction in the federal courts.  To conclude otherwise 'would preclude abstention no matter how important the state interest or how severe the federal

pursuant to their ability to intervene and participate in the current appeals of these permit limits before the EQB. *See* W. Va. Code § 22B-1-7(e) ("any person affected by the matter pending before the board may by petition intervene as a party appellant or appellee" and may offer evidence). Plaintiffs are also entitled to judicial review of the EQB orders in West Virginia circuit court under the State Administrative Procedures Act. *See* W. Va. Code § 22B-1-9 ("[a]ny person … adversely affected by an order made and entered by a board after an appeal hearing, held in accordance with the provisions of this chapter, is entitled to judicial review thereof."). Such review is subject to the provisions of § 29A-5-4 (State Administrative Procedures Act), *id.*, which provides that "[p]roceedings for review shall be instituted by filing a petition, at the election of the petitioner, in either the circuit court of Kanawha County, West Virginia or in the circuit court of the county in which the petitioner or any one of the petitioners resides or does business…." W. Va. Code § 29A-5-4. Therefore, the first prong of *Burford* abstention analysis is clearly met.

Once a court has determined that the issues at hand are subject to review in state court, the second prong of *Burford* abstention analysis requires a determination as to "whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." *Riley*, 45 F.3d at 775. In this case, this Court would risk disrupting the established procedures set forth pursuant to West Virginia's federally-approved NPDES program by exercising jurisdiction over this matter while the appeals are pending. The State Water Pollution Control Act and its implementing regulations would be virtually meaningless if plaintiffs could use this Court for a collateral attack on the State permit program.

---

interference with the state's scheme for resolution of problems Congress has seen fit to entrust to the states."' (*quoting Riley v. Simmons*, 45 F.3d 764, 775 (3d Cir. 1995)).

In the Clean Water Act, Congress made explicit its desire to grant the states primary authority:

> It is the policy of the Congress to recognize, preserve, and protect the ***primary responsibilities and rights of States*** to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) land and water resources . . . .

33 U.S.C. § 1251(b).[10]  Moreover, section 510 of the statute bars any interpretation of the Act's provisions that would "impair[] or in any manner affect[] ***any right or jurisdiction of the States*** with respect to the waters (including boundary waters) of such States[,]" except as otherwise "expressly provided" by the Act.  33 U.S.C. § 1370(2).

Courts have cited the legislative history of the Clean Water Act to demonstrate that states are intended to play the primary role in implementing NPDES programs.[11]  *See, e.g., American Paper Institute, Inc. v. United States Environmental Protection Agency*, 890 F.2d 869, 873-74 (7th Cir. 1989) ("[I]t seems beyond argument that we should construe the Act to place maximum responsibility for permitting decisions on the states where the EPA has certified a NPDES permitting program.").  *See also Chesapeake Bay Found. v. Virginia State Water*

---

[10] *See also, Rapanos v. United States*, 547 U.S. 715, 738 (2006) (Regulation of water and land use are traditional areas of state sovereignty and, absent "clear and manifest" statement, a court should not assume authority federal in this sphere of traditional state power.)

[11] *See, e.g.,* S.Rep. No. 414, 92d Cong., 1st Sess. 71 (1971), U.S. Code Cong. & Admin. News 1972, p. 3668 ("It is expected that the States will play a major role in the administration of this program (NPDES)."), *reprinted in* 2 *Legislative History of the Water Pollution Control Act Amendments of 1972*, at 1415, 1489 (1973) [hereinafter *FWPCA History*]; H.R. Rep. No. 911, 92d Cong., 2d Sess. 127 (1972) ("The Committee believes that the States ought to have the opportunity to assume the responsibilities that they have requested."), *reprinted in* 1 *FWPCA History* 753, 814; Staff Memo of Subcomm. On Investigations and Review, Comm. On Public Works and Transp., *reprinted in* 3 *A Legislative History of the Clean Water Act of 1977*, at 346 (1977) ("This process for approval of State permitting programs was included in the act to continue the primary State role in water pollution control. . . .") [hereinafter *Clean Water Act History*]; 123 Cong. Rec. 39,209 (1977) (remarks of Sen. Baker) ("The conferees believe that the State permit programs will continue to afford the best protection from potentially harmful discharges. . . ."), *reprinted in* 3 *Clean Water Act History* 524; 2569 Cong. Rec. 10,206 (1972) (remarks of Rep. Harsha) ("Unless we have meaningful local and State participation and not a Federal dictatorship, the program will founder on the rocks of the generally inflexible."), *reprinted in* 1 *FWPCA History* at 355-56; 2569 Cong. Rec. 10,209 (1972) (remarks of Rep. Kluczynski) ("The States must play a prominent part in making the water pollution law work."), *reprinted in* 1 *FWPCA History* 363.

*Control Bd.*, 495 F.Supp. 1229, 1237 (E.D. Va. 1980) (". . . Congress reserved unto the states the reviewability of state agency permitting decisions.").

The EPA approved West Virginia's NPDES program in 1982.  47 Fed. Reg. 363 (May 24, 1982).  This program includes provisions for issuing and challenging the terms and conditions of state-issued NPDES permits and orders in appeals to the EQB.  *See* W. Va. Code §§ 22-11-21; 22B-1-1 to -12 & 22B-4-1 to -4 and §§ 29A-5-1 to -5 (establishing right of appeal to EQB).  A ruling on Plaintiffs' Motion would create a risk that this Court will enter rulings that are inconsistent with rulings made by the EQB with respect to the selenium limits in Defendants' NPDES Permits.  *See Raritan Baykeeper*, 2010 WL 2079749 at *8 (finding that the court's exercise of jurisdiction in a CWA and RCRA citizen suit would disrupt state's efforts to establish coherent public policy on a matter of important state concern where there was a risk that court would enter rulings inconsistent with rulings by the delegated state agency).  Therefore, it is clear that the retention of this Court's jurisdiction would disrupt West Virginia's ability, through WVDEP and the EQB, to establish coherent public policy regarding the effluent limits for selenium.  Accordingly, this Court should abstain from this action pursuant to the *Burford* doctrine.

### F.      Plaintiffs' SMCRA Claims Should Likewise be Denied

A SMCRA citizen suit is derivative of a CWA claim.  SMCRA does not allow Plaintiffs to circumvent the CWA.  Section 702(a)(3) of the Surface Mining Act, 30 U.S.C. § 1292(a)(3), provides that, "[n]othing in this chapter shall be construed as superseding, amending, modifying, or repealing . . . The Federal Water Pollution Control Act . . . , the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality."

In this case, Plaintiffs' SMCRA claims seek to compel Defendants to comply with the terms of SMCRA permits that incorporate the same effluent limits in their NPDES permits that form the basis of Plaintiffs' CWA claims. *See* Complaint, p. 2. Hence, if Plaintiffs' CWA claims are precluded because there are no on-going violations, allowing Plaintiffs to maintain their SMCRA claims would serve as "superseding, amending, modifying, or repealing" the CWA and thus infringing upon Section 702(a). *See Sierra Club v. Powellton Coal Co., LLC*, 662 F.Supp.2d 514, 532 (S.D. W. Va. 2009) ("For instance, section 505(b)(1)(b) of the CWA precludes citizen suits based on alleged violations of effluent limitations in a NPDES permit 'if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action to require compliance [with the permit].' In such a case, to allow a SMCRA citizen suit seeking to compel compliance with a SMCRA permit incorporating the same effluent limitations to proceed could be seen as 'superseding, amending, modifying, or repealing' the CWA in contravention of section 702(a).") (internal citations omitted).

In addition, the SMCRA citizen suit provision also requires an ongoing violation. *See* 30 U.S.C. § 1270(a). If there is no ongoing violation of a CWA effluent limit, then there likewise is no ongoing violation of a SMCRA provision which requires compliance with CWA-based effluent limits.

### III. CONCLUSION

Defendants respectfully request that this Court grant judgment against the Plaintiffs as to the Permits at issue.

Respectfully submitted,

COAL-MAC, INC.,
and MINGO LOGAN COAL COMPANY

By Counsel

/s/*Robert G. McLusky*
ROBERT G. McLUSKY, WVBN 2489
DOUGLAS J. CROUSE, WVBN 11094
MATTHEW S. TYREE, WVBN 11160
JACKSON KELLY, PLLC
500 Lee Street, East, Suite 1600
P. O. Box 553
Charleston, WV 25322-0553
*Counsel for Coal-Mac, Inc. and*
*Mingo Logan Coal Company*


JOHN C. MARTIN, *Visiting Attorney*
SUSAN M. MATHIASCHECK, *Visiting Attorney*
CROWELL & MORING, LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
*Counsel for Coal-Mac, Inc. and*
*Mingo Logan Coal Company*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
COAL RIVER MOUNTAIN WATCH, INC.,
and SIERRA CLUB,

      Plaintiffs,

v.                                       CIVIL ACTION NO. 3:10-cv-00833

COAL-MAC, INC. and
MINGO LOGAN COAL COMPANY,

      Defendants.

## CERTIFICATE OF SERVICE

      I, Robert G. McLusky, do hereby certify that a true and exact copy of the foregoing **COAL-MAC, INC. AND MINGO LOGAN COAL COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND COAL-MAC AND MINGO LOGAN'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** was caused to be served upon the following via CM/ECF this 29th day of October, 2010.

                    Derek O. Teaney
                    Joseph M. Lovett
                    Appalachian Center for the Economy and the
                       Environment
                    P.O. Box 507
                    Lewisburg, WV 24901

                                     *//s//Robert G. McLusky*

{C1902017.1}