**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., et al.,

                           Plaintiffs,

v.                                         CIVIL ACTION NO. 3:10-0833

COAL-MAC, INC., and MINGO LOGAN
COAL COMPANY,

                           Defendants.

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., et al.,

                           Plaintiffs,

v.                                         CIVIL ACTION NO. 3:10-0836

INDEPENDENCE COAL COMPANY, INC., et al.,

                           Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are multiple motions and cross-motions for summary judgment in *OVEC v. Coal-Mac*, 3:10-0833, and *OVEC v. Independence*, 3:10-836.  In *Coal-Mac*, pending are Plaintiffs' Motion for Partial Summary Judgment, for Declaratory and Injunctive Relief, and to Schedule a Hearing on the Scope of Injunctive Relief (Doc. 5); Defendants' Motion for Stay of Proceedings Pending Resolution of Negotiations Between Arch Coal, Inc. and the United States Environmental Protection Agency (Doc. 13); Coal-Mac's Cross-Motion for Partial Summary Judgment (Doc. 18); Plaintiffs' Second Motion for Partial Summary Judgment and for Declaratory

and Injunctive Relief and Civil Penalties (Doc. 26); and Coal-Mac, Inc. and Mingo Logan Coal Company's Cross-Motion for Partial Summary Judgment (Doc. 37).  In *Independence*, pending are Plaintiffs' Motion for Partial Summary Judgment and for Declaratory and Injunctive Relief and Civil Penalties (Doc. 14) and Defendants' Cross-Motion for Partial Summary Judgment (Doc. 24).  Also pending are Plaintiffs' Motions to File Surreply to Defendants' Supplemental Authority in Support of Defendants' Cross Motions for Summary Judgment in *Coal-Mac* (Doc. 76) and *Independence* (Doc. 57).  Both these latter motions are **GRANTED**, and Plaintiffs' memorandums were considered in the disposition of these motions.

For the following reasons, Plaintiffs' motions for partial summary judgment in both actions are **GRANTED** and Defendants' cross-motions for partial summary judgment in both actions are **DENIED**.  Defendants' motion to stay in *OVEC v. Coal-Mac* is also **GRANTED**.

## I.  BACKGROUND

Plaintiffs[1] filed these cases pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("CWA" or the "Clean Water Act")[2] and the Surface Mining Control and Reclamation Act ("SMCRA")[3].  In each case, Plaintiffs seek enforcement of the effluent selenium limitations under West Virginia/National Pollution Discharge Elimination System ("WV/NPDES")

---

[1] Plaintiffs in both cases are Ohio Valley Environmental Coalition, Inc.; West Virginia Highlands Conservancy, Inc.; Coal River Mountain Watch, Inc.; and the Sierra Club.  They will be collectively referred to throughout this Opinion as OVEC.

[2] A citizen may, under 33 U.S.C. § 1365(a), file a suit "against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter or an order issued by the Administrator or a State with respect to such a standard or limitation." "Effluent standard or limitation" is further defined to include, *inter alia*, those standards established pursuant to section 1311 and "a permit or condition . . . issued under section 1342." 33 U.S.C. § 1365(f).

[3] Like the CWA, the SMCRA contains a citizen suit provision that allows citizens to file a suit to enforce compliance with SMCRA.  30 U.S.C. § 1270.

and West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA") permits issued by the West Virginia Department of Environmental Protection ("WVDEP") to the defendants[4]. These are not, however, straightforward enforcement cases under the citizen suit provisions—the WV/NPDES permits at issue are also subject to ongoing state proceedings in front of the Environmental Quality Board ("EQB").

Defendants in each case had sought permit modifications from the WVDEP. Each modification request proposed an extension of previously established compliance schedules governing the selenium effluent limitations. Under the existing compliance schedules, the selenium effluent limitations were set to go into effect on April 5, 2010 for the majority of the permits. The WVDEP, for differing reasons for each permit, denied the requests. Each defendant appealed the WVDEP decisions to the EQB. In addition to the formal appeals, Defendants also requested stays of the orders appealed from—the denials of the modification requests—and of the effective dates of the selenium effluent limitations from the EQB contained in the underlying permits. Defendants sought the latter relief as the limits were set to go into effect close to the time of the appeals.[5] EQB granted the requests, staying the effect of the WVDEP orders and the effective date of the selenium effluent limitations contained in the permits.

---

[4] Defendants in *OVEC v. Coal-Mac* are Coal-Mac, Inc. and Mingo Logan Coal Company, subsidiaries of Arch Coal. Defendants in *OVEC v. Independence* are Independence Coal Company and Jacks Branch Coal Company, subsidiaries of Massey Energy Company. They will be referred to collectively as the defendants, unless the identity of the parent company or the subsidiary has specific relevance to the legal and factual arguments made by the parties.

[5] With regard to two of the permits in *Coal-Mac*, Defendants Coal-Mac and Mingo Logan requested stays from the EQB prior to initiating an appeal process. The WVDEP had issued draft modifications of those permits, to which the EPA issued general and specific objections. As a result, the application process extended beyond the scheduled effective date of the limitations of April 5, 2010. Accordingly, Defendants obtained the stays in order to avoid a later grant of the modification requests running afoul of the anti-backsliding provisions of the CWA.

The fundamental issue this Court must decide in ruling on the pending motions and cross-motions for partial summary judgment is whether the EQB stays do, in fact, stay the effective date of the selenium limits.  If they do, Plaintiffs' actions are premature as Defendants are not yet in violation of their permits.  In addition, the ongoing state administrative proceedings could remove this Court's jurisdiction or establish grounds for the Court to abstain from exercising its jurisdiction. If the stays do not affect the selenium limits, then these suits are citizen enforcement actions over which this Court has jurisdiction.  In order to better understand these jurisdictional and abstention concerns, it is helpful to first review the regulatory framework that governs these actions and the factual background of the permits that are the subjects of these motions.

**A.**    **Regulatory Framework**

The primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a NPDES permit.  33 U.S.C. §§ 1311(a), 1342.  Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA.  33 U.S.C. § 1342.  A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b).  West Virginia received such approval and its NPDES program is administered through the WVDEP.  Its implementation of the NPDES program, however, remains subject to review by the EPA.

For each permit application, the WVDEP must send notice of the application to the EPA, including a copy of the proposed permit, and subsequent notice "of every action related to the

consideration of such permit application." 33 U.S.C. §§ 1342(b)(4), 1342(d)(1). All requests for modifications to existing permits must also comply with these requirements. W. Va. Code R. § 47-10-9.1.c.1; *see also 1982 Mem. of Agreement* § II-I, May 25, 1982, *Coal-Mac*, Doc. 74-1 (hereinafter "*MOA*"). The EPA has the authority to object to a draft permit or modified permit within ninety days of notification on the grounds that the permit is "outside the guidelines and requirements" of the CWA. 33 U.S.C. § 1342(d)(2); *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 871 (7th Cir. 1989); *MOA* § II-E-6. If the EPA elects to do so, "it provides a comment period, and a public hearing when requested by the state or interested parties." *Am. Paper Inst.*, 890 F.2d at 871 (citing 40 C.F.R. § 123.44(e) (1988)). Subsequently, the EPA must "reaffirm the original objection, modify the terms of the objection, or withdraw the objection . . . ." *MOA* § II-E-12; *see also Am. Paper Inst.*, 890 F.2d at 871 (citing 40 C.F.R. § 123.44(g) (1988)). If the objection is reaffirmed or modified, the State may resubmit the permit in order to comply with the stated EPA objection. *MOA* § II-E-13 & -14. If the State refuses to comply with the objection, the permit may not be issued by the WVDEP; instead, authority to issue the permit passes to the EPA. 33 U.S.C. § 1342(d)(4); *MOA* § II-E-13 & -14; W. Va. Code R. § 47-10-3.6.b.

Coal mines are also subject to regulation under the SMCRA and the WVSCMRA. The scheme under the SMCRA is somewhat different from the CWA, exhibiting greater deference to the states. *See Bragg v. W. Va. Coal Ass'n*, 248 F.3d. 275, 293 (4th Cir. 2001). Once a state receives "primacy" to administer its own program under 30 U.S.C § 1253, federal standards effectively "drop out" in favor of the state regulations, which then become the operative law. *Id.* at 295. As both the *Bragg* panel and this Court recognized, however, not all provisions of SMCRA "drop out." *Id.*; *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co.,* 531 F. Supp. 2d 747, 760–64 (S.D. W. Va. 2008)

-5-

(denying Defendants' motion to dismiss).  Although federal law is not directly enforceable, a cause of action exists to pursue certain violations of state law in federal court.  *Ohio Valley Envtl. Coal.* 531 F. Supp. 2d at 760–64.  West Virginia has been granted primacy under SMCRA and administers its state program through the WVDEP.  Three regulations passed pursuant to WVSCMRA are relevant to the present suit.  First, is a condition that mining be conducted in such a manner so as to "prevent material damage to the hydrologic balance outside the permit area."  W. Va. Code R. § 38-2-14.5.  Second, is a prohibition that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards."  *Id.* at § 38-2-14.5b.  Finally, is a provision which incorporates applicable performance standards as a condition of all mining permits.  *Id.* at § 38-2-3.33c.

Both the WVDEP and the EPA have recognized the potentially harmful effects of selenium for some time.  EPA promulgated the first water quality criterion for selenium in 1987—5 micrograms per liter of water (5 µg/l)—a criterion subsequently adopted by WVDEP.  It was not, however, until a draft Programmatic Environmental Impact Statement on the effects of mountaintop removal, published in 2003, that it became clear selenium discharges from surface mines had the potential to violate the applicable water quality standard.  With such information, the WVDEP was forced to consider the selenium water quality standard when it issued NPDES permits to mine operators and to include water quality based effluent limits in those permits.  It is these limits that are at issue in these actions.

**B.    Factual and Procedural Background of the WV/NPDES Permits**

      1.    *OVEC v. Coal-Mac*

-6-

At issue in this case are five WV/NPDES permits issued to the defendants, Coal-Mac, Inc. and Mingo Logan Company: WV1003763, WV0068764, WV1011120, WV1004956, and WV0096369. At present, only WV1003763, WV0068764, and WV1004956 are the subject of summary judgment motions, and their factual background will be provided here.

i.  *WV/NPDES Permit WV1003763*

This permit applies to Hobet No. 7 Surface Mine, located in Mingo County, West Virginia, which is owned and operated by Coal-Mac, Inc. *Pls.' Mem. Supp. Pls.' Mot. Partial Summ. J.* 3, Doc. 6 (hereinafter *Pls.' Mem.*, *Coal-Mac*). Its counterpart permit issued under the SMCRA is Surface Mining Permit S507492. *Am. Compl.* ¶ 49, Doc. 57. The WV/NPDES permit governs discharges into the Left Fork of Right Fork of Trace Fork of Pigeon Creek from Outfall 002. *Id.* ¶ 50. This permit was reissued by the WVDEP to the defendant on December 2, 2008; at that time, it included final selenium limits effective with the reissuance of the permit. *Id.* ¶ 51.

Defendant Coal-Mac sought a modification of this WV/NPDES permit from the WVDEP, specifically requesting an extension of the compliance schedule for the selenium effluent limitations. *Notice of Appeal & Req. for Stay*, Doc. 18-1. The state agency denied this request on March 8, 2010 on the grounds that granting the modification would violate the anti-backsliding provisions of the CWA. *Id.* Subsequently, on April 6, 2010, Coal-Mac filed an appeal in front of the EQB, seeking a reversal of the denial and a stay of the effect of the selenium limits in the permit. *Id.* EQB granted the stay of the WVDEP order, finding "that to allow the compliance schedule to expire prior to a decision by this Board on the appeal of WVDEP's decision would result in a violation of the due process rights of the Appellant." *Order Granting Appellant's Mot. for Stay*, Doc. 18-2. The

WVDEP sought a modification of the stay order, which the EQB denied on May 29, 2010.  *Upon Reconsideration Order Granting Mot. for Stay*, Doc. 18-3.

This permit is also subject to a motion to stay filed by Defendant Coal-Mac (Doc. 13). Defendant and the EPA have entered into a consent order regarding violations with respect to this permit.  This Consent Order has set a compliance schedule to meet the selenium effluent limitations under WV/NPDES Permit 1003763.  *See Consent Decree* § VIII, Doc. 84-1.  The consent order has not yet been finalized.

ii.    *WV/NPDES Permit WV0068764*

This permit applies to various mines owned and operated by Defendant Coal-Mac, located near Island Creek in Mingo and Logan Counties.  It was initially issued by the WVDEP on July 27, 2004.  *Am. Order No. 5* 1, Doc. 26-3.  The associated Surface Mining Permits are S006983, S007280, S501494, U503595, O51600, S503695, and S505289.  *Am. Compl.* ¶ 55, Doc. 57.  The WV/NDPES permit limits discharges into Laurel Fork of Right Fork of Pine Creek from Outfall 001, into Fivemile Creek from Outfall 003, and into Right Fork of Trace Fork of Pigeon Creek from Outfall 014.  *Id.* ¶ 56.  This permit was the subject of Amended Order No. 5 issued by the WVDEP on April 5, 2007, which delayed the effective date of the permit's final selenium effluent limitations until April 5, 2010.  *Am. Order No. 5*, Doc. 26-3.  It also required Coal-Mac to commence construction of selenium treatment facilities by October 5, 2008, and to complete installation of the requisite selenium treatment facilities by April 5, 2010.  *Id.* at 35.

Defendant Coal-Mac sought a modification of this permit on March 15, 2010.  *Modification No. 12*, Doc. 37-3.  The WVDEP initially agreed to grant this request, issuing a draft modified permit, which was subject to public notice and comment and EPA review.  The EPA issued a

specific objection to the draft modified permit on May 27, 2010.  *Letter from Thomas L. Clarke, WVDEP, to Jon M. Capacasa, EPA* (Aug. 24, 2010), Doc. 37-11.  Following the procedures prescribed under federal law, the WVDEP responded to the EPA, stating that it could not resolve the specific objection.  *Id.*  The agency nonetheless denied the modification request, and instead filed a civil enforcement against Coal-Mac.  *Id.*

Prior to the issuance of the specific objection by the EPA or the WVDEP's final resolution of the modification request, Defendant sought a stay before the EQB of the effective date of the underlying selenium limits in the permit.  *Order Granting Stay*, Doc. 37-7.  As grounds for the request, Defendant stated that it had sought a timely modification of its compliance schedule, but that final disposition could occur after the limits were to go into effect.  *Id.* ¶ 2.  Defendant therefore feared that any grant of the modification request could run afoul of the anti-backsliding provisions of the CWA.  *Id.*  The EQB granted this request, finding that the possibility of a delayed decision by the WVDEP in light of the EPA review process could cause "irreparable harm from which Appellants would have no effective relief."  *Id.*  The EQB ordered the stay to be in effect until a further ruling by the WVDEP or the EQB, and, if the WVDEP denied the request, through any appeal of that decision to the EQB.  *Id.* ¶ 2(b).[6]  Accordingly, the stay has been in effect throughout all of the state administrative proceedings.

### iii.    *WV/NPDES Permit WV1004956*

This permit was initially issued to Defendant Mingo Logan on March 28, 2005.  *Am. Order No. 45*, Doc. 26-6.  It applies to the Left Fork No. 2 Mine located in Logan County, and is owned

---

[6] This permit is also the subject of an injunction issued by the Circuit Court of Kanawha County.  *See Order*, Doc. 37-8.  The Court does not believe this injunction has any bearing on the issue of this Court's jurisdiction over this action, and therefore does not address it here.

and operated by Mingo Logan. *Letter from Terah S. Burdette, Arch Coal, to Doug Boone, WVDEP* (Jan. 29, 2010), Doc. 26-7. Its associated Surface Mining Permits are S508187 and U508886. *Am. Compl.* ¶ 65, Doc. 57. It limits discharge into Left Fork of Beech Creek from Outfall 001 and into Dingess Run from Outfall 015. *Id.* ¶ 66. Amended Order No. 45, issued by WVDEP on April 5, 2007, delayed the effective date of the final selenium effluent limitations until April 5, 2010. *Am. Order No. 45*, 16, Doc. 26-6. The Amended Order also required Mingo Logan to commence construction of selenium treatment facilities by October 5, 2008, and to complete installation of the facilities by April 5, 2010. *Id.* However, WVDEP re-issued this permit on August 14, 2007—after the issuance of the Amended Order No. 45—setting the effective date of the final selenium limits as March 29, 2008. *Am. Compl.* ¶ 68, Doc. 57.

Defendant Mingo Logan sought a permit modification in January, 2010 from the WVDEP, seeking an extension of the compliance schedule until July 1, 2012. *Letter from Terah S. Burdette, Arch Coal, to Doug Boone, WVDEP* (Jan. 29, 2010), Doc. 26-7; *see also* Docs. 37-4, 37-5. Similar to WV/NPDES Permit WV0068764, the WVDEP began the approval process, issuing a draft permit for review by the EPA and public notice and comment. The EPA initially made a general objection, followed by a specific objection issued on May 27, 2010. *Letter from Jon M. Capacasa, EPA, to Scott Mandirola & Thomas Clarke, WVDEP* (Mar. 31, 2010), Doc. 44-4; *Letter from Thomas L. Clarke, WVDEP, to Jon M. Capacasa, EPA* (Aug. 24, 2010), Doc. 37-10. The WVDEP indicated that it could not resolve the objection, but nonetheless denied the modification request in light of a civil suit it filed against Mingo Logan. *Id.* Defendant Mingo Logan likewise sought a stay from the EQB in light of the delay in the final disposition of the modification request and, similarly, the EQB

granted the stay for the duration of the process, including any subsequent appeal of a denial of the modification request to the EQB.[7]  *Order Granting Stay*, Doc. 37-7.

### 2.      *OVEC v. Independence*

The defendants in this case, Independence Coal Co. and Jacks Branch Coal Company, are subsidiaries of Massey Energy Company.  *Compl.* ¶ 12, Doc. 1.  At issue in this case are three WV/NPDES permits issued to the defendants Independence Coal Co. and Jacks Branch Coal Company: WV1016890, WV1017152, and WV0093912.  *See Compl.*, Doc. 1.  The partial summary judgment motion applies to all claims in this case, but does not include Outfall 023 of Independence's WV1017152 permit; Outfall 014 of Jacks Branch's WV0093912 permit; or Outfall 004 of Independence's WV1016890 permit.  *See Pls.' Mem. Supp. Pls.' Mot. Partial Summ. J.* 15 n.3, Doc. 21 (hereinafter *Pls.' Mem.*, *Independence*).

### i.      *WV/NPDES Permit WV1016890*

This permit was issued to Defendant Independence on April 5, 2005.  *Am. Order No. 47* 1, Doc. 15-3.  It applies to Twilight MTR Surface Mine, located in Boone and Raleigh Counties.  *Id.* at 2.  Its counterpart under the SMCRA is Surface Mining Permit S502396.  *Compl.* ¶ 45.  It places limits on discharges into Mats Creek from Outfall 004 and into James Creek from Outfalls 008 and 015.  *Id.* ¶ 46.  On April 5, 2007, the WVDEP issued Amended Order No. 47, which delayed the effective dates of the selenium effluent limitations until April 5, 2010, and required Independence

---

[7] The order granting the stay lists Mingo Logan permit WV1002956, rather than 1004956. The Court believes this may be a typographical error, especially in light of the injunction granted by the Kanawha County Circuit Court, which lists the same permits, but includes 1004956 rather than 1002956.  *Compare Order Granting Stay*, Doc. 37-7, *with Order Granting Injunction*, Doc. 37-9.  As with Coal-Mac's permit WV0068764, Mingo Logan's permit is the subject of an injunction issued by the Circuit Court of Kanawha County.  The Court does not believe this injunction has any bearing on the issue of this Court's jurisdiction over this action, and therefore does not address it here.

to commence construction of selenium treatment facilities by October 5, 2008, and complete installation by April 5, 2010. *Am. Order No. 47* 2, 9, Doc. 15-3. Independence sought a modification of the permit, requesting an extension of the compliance schedule for selenium; the WVDEP denied this request on March 8, 2010. *Letter from Thomas L. Clarke, WVDEP, to Independence Coal Company Inc.* (Mar. 8, 2010), Doc. 15-4. Independence appealed the WVDEP's decision to the Environmental Quality Board, simultaneously seeking a stay of the denial order and the underlying selenium effluent limitations. *Notice of Appeal & Req. for Stay*, Doc. 24-1. The EQB granted the stay, stating that in order to stay the implementation of the denial orders, the permits and compliance schedules were likewise stayed. *Order Granting Appellant's Mot. for Stay*, Doc. 24-3.

### ii.     *WV/NPDES Permit WV1017152*

This permit was issued to Defendant Independence on August 20, 2004. *Order No. 1066* 1, Doc. 15-7. It applies to the Red Cedar Surface Mine No. 1 in Boone County. *Compl.* ¶ 15, Doc. 1. Its counterpart under the SMCRA is Surface Mining Permit S503907. *Id.* The permit places limits on discharges into Trace Branch of Spruce Laurel Fork from Outfalls 023, 042, and 046, and into Bull Creek of Pond Fork from Outfalls 029, 031, and 037. *Id.* ¶ 57. On April 5, 2007, WVDEP issued Order No 1066 to Independence, delaying the effective date of the selenium effluent limitations until April 5, 2010. *Order No. 1066* 2, Doc. 15-7. The Order also required Independence to commence construction of selenium treatment facilities by October 5, 2008, and complete installation by April 5, 2010. *Id.* at 12.

Independence filed an application to obtain a modification of this permit. In particular, it sought an extension of the compliance schedule for selenium. *Letter from Thomas L. Clarke, EPA*

*to Independence Coal Co.* (Mar. 8, 2010), Doc. 15-8.  The WVDEP denied this request, finding that Independence had failed to establish "good cause" for an extension as the company's failure to take action to comply with the selenium effluent limitations led the WVDEP to "conclude that events over which [Independence had] little or no control [did not] prevent [it] from complying."  *Id.* Independence appealed the WVDEP's decision to the EQB, which granted a stay pending further review.  *See Notice of Appeal & Req. for Stay*, Doc. 24-1; *Order Granting Appellant's Mot. for Stay*, Doc. 24-3.

### iii.   *WV/NPDES Permit WV0093912*

This permit was issued to Defendant Jacks Branch on January 22, 2007.  *Am. Order No. 18 1*, Doc. 16-3.  It applies to the Kanawha Division Surface Mines in Kanawha County.  *Compl.* ¶ 16. The associated Surface Mining Permits are S000684, S004577, S008379, S061570, S303790, U002985, U005584, U300197, and Z000481.  *Id.*  The permit limits discharges into Bullpush Fork of Smithers Creek from Outfalls 004 and 012; into Sixmile Hollow of Hughes Creek from Outfall 005; into Hughes Fork of Bells Creek from Outfall 007; and into Hughes Creek from Outfalls 014, 022, 033, and 034.  *Id.* ¶ 68.  On April 5, 2007 the WVDEP issued an Amended Order to Jacks Branch, extending the compliance dates for the selenium effluent limitations to April 5, 2010.  *Am. Order No. 18 2*, Doc. 16-3.  The Order also requires Jacks Branch to commence the construction of selenium treatment facilities by October 5, 2008, and complete construction by April 5, 2010.  *Id.* at 42.

Jacks Branch applied for a modification of the permit, seeking an extension of the selenium compliance schedule.  *Letter from Thomas L. Clarke, WVDEP, to Jacks Branch Coal Company* (Mar. 24, 2010), Doc. 16-4.  The WVDEP rejected this application, finding, *inter alia*, "that the

public comment period on the draft permit for this modification that is mandated by 47 CSR 30, section 10.2.a.2.A, cannot be completed before final effluent limitations for selenium will be in effect." *Id.* Jacks Branch sought review of the WVDEP's decision by the EQB, which granted a stay pending further review. *Notice of Appeal & Req. for Stay*, Doc. 24-2; *Order Granting Appellant's Mot. for Stay*, Doc. 24-4.

## II. SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(a). When cross-motions for summary judgment are filed, "the fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *Podberesky v. Kirwan*, 38 F.3d 147, 156 (4th Cir. 1994) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 2720 (2d ed. 1983)). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient

to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III.  DISCUSSION

Defendants raise multiple arguments against Plaintiffs' motions for partial summary judgment and for their own cross-motions for partial summary judgment. First, Defendants allege that Plaintiffs have failed to satisfy standing requirements. Second, Defendants assert a number of justiciability and jurisdictional grounds on which basis Defendants argue they should be granted summary judgment or, at a minimum, the Court should abstain from deciding this case until ongoing state proceedings are completed. Third, Defendants state there are several aspects of Plaintiffs' claims where material issues of fact still remain in dispute and, therefore, summary judgment should be denied. The Court will first examine the merits of these arguments and Plaintiffs' counter-arguments, and then will turn to the grounds for Plaintiffs' motions for partial summary judgment.

## A.  <u>Standing</u>

Defendants claim that Plaintiffs have failed to establish standing in both actions, *OVEC v. Coal-Mac* and *OVEC v. Independence*. In *Coal-Mac*, Defendants argue that Plaintiffs have not established injury in fact or redressability. *Defs.' Resp. Opp'n to Pls.' 2d Mot. Partial Summ. J. & Cross-Mot. Partial Summ. J.* 9, Doc. 38 (hereinafter *Defs.' 2d Resp.*, *Coal-Mac*). In *Independence*, Defendants assert that Plaintiffs have failed to establish injury in fact, citing the recent Supreme Court standing case *Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009). *Defs.' Resp. Opp'n Pls.' Mot. Partial Summ. J. & Defs.' Cross-Mot. Partial Summ. J.* 8, Doc. 24 (hereinafter *Defs.' Resp.*, *Independence*). These arguments will be addressed in turn.

### 1.      Standing Requirements

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*, 204 F.3d 149, 153 (4th Cir. 2000) (citation omitted); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies").   In order to satisfy the minimum constitutional requirements for standing, the United States Supreme Court repeatedly has stated that a plaintiff must demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

When the plaintiff in question is an organization, it "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).   Among the injuries that may be addressed by a federal court are those to "an individual's aesthetic or recreational interests." *Gaston*

*Copper*, 204 F.3d at 154. This is of particular relevance to environmental cases. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972).

### 2. Plaintiffs Have Established Injury in Fact and Redressability in *Coal-Mac*

#### i. *Injury in Fact*

Defendants in *Coal-Mac* assert that Plaintiffs have failed to satisfy the standing requirements. First, Defendants argue that Plaintiffs have failed to prove "actual use or enjoyment of the relevant waters" and, therefore, do not satisfy the injury in fact standing requirement. *Defs.' 2d Resp.*, *Coal-Mac* 9, Doc. 38. Defendants allege that the declarations reflect that the members are "a sort of 'roving environmental ombudsman seeking to right environmental wrongs wherever [he or she] might find them.'" *Id.* at 11 (citing *Gaston Copper*, 204 F.3d at 157). Defendants cite *Mancuso v. Consol. Edison Co. of N.Y.*, 324 F. Supp. 2d 469 (S.D.N.Y. 2004) as support for the argument that Plaintiffs have manufactured their injury in order to establish standing. In that litigation, the plaintiffs lacked standing as their only visits to the affected area had no other purpose "than to obtain evidence to support th[e] lawsuit. Any aesthetic injury experienced as a result of these visits [wa]s therefore simply a byproduct of th[e] lawsuit and cannot satisfy even the minimal showing of injury-in-fact needed to meet the standing requirement." *Mancuso*, 324 F. Supp. 2d at 471.

Defendants have made this argument in front of this Court before. In *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*, 479 F. Supp. 2d 607, 618–19 (S.D. W. Va. 2007), *rev'd on other grounds sub nom. Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), this Court found the plaintiffs' members' declarations distinguishable from those in *Mancuso* as plaintiffs' members alleged recreational uses of the affected areas. This finding was affirmed by the Fourth Circuit. *Aracoma*, 556 F.3d at 193 n.10.

A similar conclusion is warranted here. Each of the declarants has alleged recreational uses of the affected areas. For example, Maria Gunnoe details a lifelong use of Beech Creek and Spruce Fork, and describes how ongoing pollution affects her current use. *Am. Decl. of Maria Gunnoe* ¶¶ 14–17, Doc. 35-3. In addition, each declarants' use of the relevant waters predates the current action. *See, e.g.*, *Am. Decl. of Cindy Rank* ¶¶ 23–24 (Doc. 35-1); *Am. Decl. of Vivian Stockman* ¶ 17 (Doc. 35-2); *Am. Decl. of Maria Gunnoe* ¶ 14, Doc. 35-3; *Am. Decl. of Chuck Nelson* ¶ 14, Doc. 35-4.

Further, the idea that the declarants' environmental activism automatically precludes them from ever fulfilling the requirements for standing does not withstand review. This Court has previously cited *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000), for the principle that there is no "particular formula for establishing a sufficient concrete and particularized aesthetic or recreational injury-in-fact." *Ecological Rights Found.*, 230 F.3d at 1150 (citations & quotation omitted); *see also Mem. Op. & Order* 6, May 2, 2008, *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., Inc.*, Civ. No. 3:07-cv-413, Doc. 67. The Ninth Circuit described the necessary showing of injury in fact as:

> a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded. Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner.

*Ecological Rights Found.*, 230 F.3d at 1149. Here, Plaintiffs' members have certainly alleged "concern sufficient to make credible" the harm caused by Defendants' alleged violation of the selenium effluent limitations. For example, Chuck Nelson states that both his aesthetic values and his recreational pursuits have been harmed by selenium pollution, stating that "water pollution in the headwaters of Spruce Fork makes [him] very angry and [he] hope[s] it will be cleaned up soon

so that [he] can enjoy it like [he] used to do." *Am. Decl. of Chuck Nelson* ¶ 15, Doc. 35-4.  He also states that he "now refrain[s] from fishing because [he is] concerned about water quality" and that even if he did fish, he would feel unsafe eating what he caught.  *Id.* ¶ 14.

The fact that some of the declarants' interaction with the affected water bodies is a result of their environmental activism does not make less credible the "contention that [their] future life will be less enjoyable" as a result of the alleged selenium pollution.  *Ecological Rights Found.*, 230 F.3d at 1149.  In fact, the long-term use of these streams by Plaintiffs' members, their involvement in environmental organizations in West Virginia, and the aesthetic and recreational interests detailed by each declarant give meaning to the assertion that Plaintiffs are "bring[ing] this suit to vindicate [their] private interests . . . not some ethereal public interest," making each more than "a roving environmental ombudsman." *Gaston Copper*, 204 F.3d at 157.  Accordingly, the Court **FINDS** that Plaintiffs have satisfied the injury in fact prong of the standing requirements.

### ii.   *Redressability*

Defendants contend that a portion of the alleged harms to Plaintiffs' members are not redressable.  Some of the alleged harms by the declarants relate to the "human health" category of designated uses of a stream, in particular "water contact recreation" such as swimming and fishing.  Because there is no limit on selenium concentrations for these uses, Defendants argue that "to the extent that Plaintiffs allege any potential harm to humans by virtue of wading or contact, their claims are not redressable and fail to establish standing." *Defs.' 2d Resp.* 13–14, *Coal-Mac*, Doc. 38.  Plaintiffs counter that these harms are not the sole, nor the main, basis for standing.  Instead, redressability is "primarily based on Plaintiffs' aesthetic injuries." *Pls.' Reply Defs.' Resp. Opp'n*

*Pls' 2d Mot. Partial Summ. J. & Pls' Resp. Defs. Cross-Mot. Partial Summ. J.* 11, Doc. 46 (hereinafter *Pls' 2d Reply*, *Coal-Mac*).

The Court agrees with Plaintiffs' characterization of the harms sought to be redressed by the enforcement of the selenium effluent limitations. If Defendants comply with the limitations, the loss of enjoyment resulting from the current selenium discharges detailed in the declarations will be redressed. This characterization of the redressability prong of the standing requirements finds support in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000). There, the affiant was found to have "reasonable fear and concern about the effects of [the defendant's] discharge . . . [that] directly affect his recreational and economic interests" to establish injury in fact; the Fourth Circuit found that the cessation of violations of the defendant's NPDES permit was sufficient to redress the harm alleged. *Gaston Copper*, 204 F.3d at 161, 163. The Court **FINDS** that the cessation of violations of the selenium effluent limitations contained in Defendants' NPDES permits would redress the alleged harm to Plaintiffs' members' aesthetic and recreational interests. Accordingly, Plaintiffs satisfy the redressability prong of the standing requirements.

### 3. Plaintiffs Have Established Injury in Fact in *Independence*

Defendants in *Independence* likewise aver that Plaintiffs have failed to establish standing. In particular, they assert that Plaintiffs have not fulfilled the requirements of the injury in fact prong. In making this argument, Defendants rely on the recent United States Supreme Court case on standing, *Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009), where the Supreme Court affirmed the importance of the imminency and concreteness of the harm alleged in establishing standing. In *Summers*, the plaintiffs were challenging United States Forest Service regulations that excluded certain timber salvage sales from the procedures required under the Forest Service

Decisionmaking and Appeals Reform Act. *Summers*, 129 S. Ct. at 1147. In the action at the district court level, they specifically challenged the application of the regulations to a particular sale. *Id.* at 1147–48. The dispute over that sale, however, settled prior to the adjudication of the validity of the regulatory exemption. *Id.* With the dispute settled, at issue was whether the plaintiffs still had standing to challenge the regulations.

The Court found that standing could only be established "if application of the regulations by the Government will affect" plaintiffs in a manner that satisfied the three prongs of standing. *Id.* at 1149. The Court discussed one affidavit in depth, finding that it did not satisfy standing requirements as "it was not tied to application of the challenged regulations, . . . it does not identify any particular site, and because it relates to past injury rather than imminent future injury." *Id.* at 1150. The Court observed that the declaration relied on too speculative of a connection, stating that "[a]ccepting an intention to visit the National Forests as adequate to confer standing to challenge any Government action affecting any portion of those forests would be tantamount to eliminating the requirement of concrete, particularized injury in fact." *Id.* In particular, the Court stated that a "vague desire to return is insufficient to satisfy the requirement of imminent injury: 'Such "some day" intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.'" *Summers*, 129 S. Ct. at 1150–51 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1999)).

Defendants argue that the declarations of Plaintiffs' members merely allege past injury, and fail to adequately allege future plans to return to the areas in question. *Defs.' Resp.* 8–10, *Independence*, Doc. 24. Specifically, Defendants refer to the "generally" stated intentions of the

declarants to visit the creeks in question in the future as falling within the "some day intentions" prohibited in *Summers*. *Id.* The Court disagrees with this characterization of the plaintiffs' members' declarations. First, *Summers* contained a different legal context than that in the action before this Court. At issue there was the impact of regulations on timber sale projects. As the Supreme Court noted, the plaintiffs could "demonstrate standing only if application of the regulations by the Government [would] affect *them* . . . ." *Summers*, 129 S. Ct. at 1149. Much of the Court's discussion regarding imminency requirements was related to the context of the challenged regulations.

Here, Plaintiffs have filed a traditional citizens' suit under the CWA and the SMCRA. The concerns relevant to the *Summers* context do not provide much guidance. Instead, the analysis of the Supreme Court in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, a CWA permit case, is more applicable. In that case, the Supreme Court found that the plaintiffs' members' concerns regarding the effects of the challenged discharges "directly affected those affiants' recreational, aesthetic, and economic interests." 528 U.S. 167, 183–84 (2000). Further, the conditional statements of use—that but for the discharges, they would use the affected water body—could not "be equated with the speculative 'some day intentions' to visit endangered species halfway around the world [found] insufficient to show injury in fact in *Defenders of Wildlife*." *Id.* at 184. Here, the declarations provide similar statements of concern and conditional use to those found sufficient to establish injury in fact in *Laidlaw*. *See, e.g.*, *Am. Decl. of Maria Gunnoe* ¶¶ 10, 19–21, Doc. 29-7; *see also*, *Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1223 (D. Mont. 2010) ("*Summers* has little or no application to this case because the ruling in *Summers* hinged on the absence of a project that could result in injury to the plaintiffs. In this

case there is a proposed action and the individual members have alleged an injury flowing from that action.").

Second, the declarations proffered by Plaintiffs in this action do not suffer from the same inadequacies as the declaration in *Summers*.  In that case, the affiant did not state plans to go to a specific tract of National Forest, but instead evinced a general desire to go in the future.  In contrast, here, the declarations detail past use of the water bodies in question that, combined with their stated future intentions, sufficiently establish imminent and concrete harm.  *See, e.g.*, *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) ("Where the recreational use of a particular area has been extensive and in close proximity to the plaintiff, we have held that an affiant's expressed intention to continue using the land is sufficiently concrete to underwrite an injury-in-fact.").  For example, James Tawney stated: "I last picnicked at Bells Creek in April of 2010 and will return to the area to picnic or visit at least three times in the next two years and intend to continue my visits thereafter."  *Am. Decl. of James Tawney* ¶ 11, Doc. 29-3.  He also stated that his concerns about water pollution and, in particular, selenium, prevented him from keeping or eating fish caught in Bells Creek in past and future planned visits.  *Id.* ¶ 12.  His Amended Declaration describes a substantial past connection to the watersheds along with a present intention to continue using the area for recreational and aesthetic purposes.  The other amended declarations allege similar past uses and connections with the streams affected and the affiants' future plans.  *See* Docs. 29-4 – 29-8.  In contrast to the declaration in *Summers*, Plaintiffs' members allege more than just a desire to go the affected area.  The Court **FINDS** that these declared future intentions to visit the relevant water bodies, and the aforementioned stated concerns of the affiants and descriptions of past use and future

conditional use, successfully allege harms that are "concrete and particularized" and "actual or imminent" and, therefore, satisfy the injury in fact prong. *Laidlaw*, 528 U.S. at 180.

**B.**    **Plaintiffs Have Proven That Defendants Have Discharged into Navigable Waters of the United States**

Defendants in *Independence* argue that Plaintiffs failed to prove that the defendants discharged into navigable waters of the United States. For the CWA to apply, a discharge must be into navigable waters, which are defined as "waters of the United States, including territorial seas." 33 U.S.C. §§ 1362(12) & (7). This definition is further refined by the Supreme Court of the United States as "only relatively permanent, standing or flowing bodies of water." *Rapanos v. United States*, 547 U.S. 715, 732 (2006). Defendants argue that because Plaintiffs did not "assert that any of the waters that Defendants discharge into constitute 'navigable waters,' and have provided no evidence thereto," they have not met their burden for summary judgment as there is a question of material fact. *Defs.' Resp.* 11, *Independence*, Doc. 24.

For a plaintiff to bring an action under the citizen suit provisions, the suit must be against an individual or entity "alleged to be in violation of (A) an effluent standard or limitation or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a). Effluent standard or limitation is further defined as, *inter alia*, "a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter." 33 U.S.C. § 1365(f)(6). Plaintiffs argue that their allegations fall under this definition and, accordingly, they must only establish that a permit was issued under § 1342 and that violations of the permits' conditions occurred—not that a discharge occurred into navigable waters of the United States. *Pls.' Reply Defs.' Resp. Opp'n Pls.' Mot. Partial Summ. J. & Pls.' Resp. Defs.' Cross-Mot. Partial Summ.*

-24-

*J.* 11–12, Doc. 32 (hereinafter *Pls.' Reply, Independence*).  Plaintiffs solely seek to enforce the requirements of the § 1342 permits issued to Defendants.

The Court agrees with Plaintiffs' representation of the statutory requirements for a citizen suit under § 1365(f)(6).  Essentially, the NPDES program was created to transform generally applicable provisions of the CWA into specific obligations of the individual pollutant discharger. *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976) ("An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations (including a timetable for compliance) of the individual discharger[.]").  If Plaintiffs were seeking to establish that Defendants were committing unpermitted discharges under § 1365(f)(1) or (2) in violation of effluent limitations established under § 1311 of the CWA, then they would be required to establish that the alleged discharges occurred in a navigable water of the United States.  Plaintiffs, however, do not have to satisfy such a high threshold.  Defendants, as holders of WV/NPDES permits, are obligated to comply with all requirements of the permits.[8]  To satisfy their burden, Plaintiffs need only prove that the specified selenium effluent limitations were in effect and that Defendants were in violation of their obligations with respect to those permits and those limits.  Accordingly, this Court **FINDS** that as to the question of navigable waters, there is not a material fact in dispute in this action.

---

[8] In addition, Plaintiffs cite *SPIRG of New Jersey v. Anchor Thread Co.*, 22 ERC 1150 (D.N.J. 1984) for the premise that if Defendants had wished to challenge the navigability of the streams, it could have done so through administrative review at the time the permit was issued.  As Defendants chose not to do so, it cannot "raise the invalidity on the navigable waters issue" in this forum.  *SPIRG*, 22 ERC at 1153.

C.     **The *Rooker-Feldman* Doctrine Does Not Apply**

Defendants in *Independence* make the additional argument that this Court should decline to exercise its jurisdiction under the *Rooker-Feldman* doctrine.  This doctrine gains its name from two separate Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  It stems from the statutory limitations on appellate review of state court decisions found in 28 U.S.C. § 1257(a): "Final judgment or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court . . . ."  Where a state court judgment is appealed to a district court, such a court "lack[s] subject-matter jurisdiction over the claim because '[u]nder the legislation of Congress, no court of the United States other than [the Supreme Court] could entertain a proceeding to reverse or modify [a state-court] judgment for errors of [Constitutional] character.'" *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 716 (4th Cir. 2006) (quoting *Rooker*, 263 U.S. at 416).  The Supreme Court has further elucidated this doctrine in a recent case, *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005).  In that case, the Court held that the doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284; *see also Davani*, 434 F.3d at 718.

Defendants attempt to equate the EQB stays with state court judgments.  If this were the case, a judgment entered by this Court contrary to the EQB's stays "would vitiate an underlying state judgment."  *Johnson v. City of Shorewood, Minn.*, 360 F.3d 810, 818 (8th Cir. 2004) (citing *Lemonds v. St. Louis Cnty.*, 222 F.3d 488, 492 (8th Cir. 2000); *Feldman*, 460 U.S. at 483;

-26-

*Rooker*, 263 U.S. at 416). This argument, in light of the *Exxon Mobil* decision, stretches the *Rooker-Feldman* doctrine too far. First, Plaintiffs are not "state-court losers." Defendants have not identified a lower court proceeding in which Plaintiffs participated; their ability to participate in the EQB proceedings does not mean this doctrine applies to them. Second, Defendants have not identified a state level judgment that Plaintiffs are asking this Court to review. Plaintiffs are seeking enforcement of WV/NPDES permits; they are not collaterally attacking the ongoing EQB proceedings. As the Supreme Court further stated:

> When there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court. This Court has repeatedly held that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." Comity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation. But neither *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court.

*Exxon Mobil Corp.*, 544 U.S. at 292 (citations omitted). For the foregoing reasons, the Court **FINDS** that the *Rooker-Feldman* doctrine does not apply in these cases.

## D. *Burford* **Abstention Does Not Apply**

Defendants also argue that the Court should abstain from exercising its jurisdiction under *Burford* abstention, which gets its name from *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). In cases "[w]here timely and adequate state-court review is available," *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*"),

> *Burford* permits abstention when federal adjudication would "unduly intrude" upon "complex state administrative processes" because either: (1) "there are difficult questions of state law . . . whose importance transcends the result in the case then at bar"; or (2) federal review would disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (quoting *NOPSI*, 491 U.S. at 361–63 ).  The

Supreme Court of the United States has recognized that this doctrine "represents an extraordinary

and narrow exception to the duty of the District Court to adjudicate a controversy properly before

it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (citation and quotation omitted).

The Court has summarized the doctrine as an:

> equitable decision [which] balances the strong federal interest in having certain
> classes of cases, and certain federal rights, adjudicated in federal court, against the
> State's interests in maintaining uniformity in the treatment of an essentially local
> problem, and retaining local control over difficult questions of state law bearing on
> policy problems of substantial public import.

*Id.* (citations and quotations omitted).

Defendants primarily rely on *Raritan Baykeeper, Inc. v. NL Industries, Inc.*, 713 F. Supp. 2d

448 (D.N.J. 2010) for their argument that *Burford* abstention applies in these cases.  In that case, the

district court found that the plaintiffs could have sought "timely and adequate state-court review"

of their claims under the state and federal versions of the CWA and the Resource Conservation and

Recovery Act ("RCRA") as New Jersey's Environmental Rights Act contains a citizen suit

provision.  *Raritan*, 713 F. Supp. 2d at 458.  The district court also found that if it exercised its

jurisdiction, the court could "interfer[e] with NJDEP efforts to implement state policy regarding

remediation and redevelopment of contaminated sites . . . ." *Id.*  The cases currently before this

Court are distinguishable from that presented in *Raritan*.  Unlike New Jersey, West Virginia does

not have a citizen suit provision through which Plaintiffs could obtain state court review of their

enforcement challenges.  Defendants argue that Plaintiffs could participate in the ongoing state

proceedings regarding the EQB stays and appeals of the denials of the modification requests.  While

this is true, this would only be dispositive if Plaintiffs' current actions were seeking a review of

those proceedings; instead, Plaintiffs are pursuing federal citizen enforcement actions.  *See, e.g.,* *Interfaith Cmty. Org. Inc. v. PPG Indus.*, 702 F. Supp. 2d 295, 308–09 (D.N.J. 2010).

Plaintiffs counter, arguing that the cooperative federalism structure under the CWA is more akin to the Medicaid scheme challenged in *Virginia Hospital Association v. Baliles*, 868 F.2d 653 (4th Cir. 1989) than the RCRA claims in *Raritan*.  In *Virginia Hospital*, the Fourth Circuit found that *Burford* abstention did not apply to a challenge brought against Virginia's procedures for reimbursing hospitals for Medicaid costs.  In so ruling, the court found that these procedures were "not the sort of comprehensive regulatory system it was bound to respect through abstention." *Virginia Hosp.*, 868 F.2d at 665.  In particular, the court found probative that the plaintiff could not have obtained relief for its federal claims through the state administrative procedures, and that Medicaid was "the subject of both state and federal concern."  *Id.*  The Court agrees with this characterization of the balance struck between state authority over the NPDES permitting system, and the ultimate controlling federal law.

First, as already established above, the first prong of *Burford*—"adequate and timely state-court review"—is not available for a traditional citizen enforcement suit in West Virginia as there is no citizen enforcement provision under state law.  Second, many of the arguments Plaintiffs make with regard to the legitimacy of the EQB stays are based on the stays' possible contravention of various federal law requirements.  If the Court abstains under the *Burford* doctrine, thereby not reaching the merits of these arguments, it would be neglecting its duty to ensure that the federal law requirements are complied with, and it would deny Plaintiffs a forum for their citizen enforcement suit.

Third, the questions at issue in these cases are not complicated questions of state law; they are complicated questions regarding the overlap of federal and state law provisions.  In *Raritan*, the district court relied on the state's comprehensive scheme regarding remediation of contaminated lands as the basis for *Burford* abstention.  Thus, the district court's reasoning relied on the RCRA claims and the local concerns regarding reclamation of discrete parcels of land, and not the claims under the CWA.  In contrast, while West Virginia has established a state-level administrative review process, this review scheme is intertwined with an issue of national concern, the regulation of water pollution.  *See, e.g.*, *Or. State Pub. Interest Research Grp., Inc. v. Pac. Coast Seafoods Co.*, 341 F. Supp. 2d 1170, 1178 (D. Or. 2004) ("To avoid violating federal law [under the CWA], state laws and regulations must satisfy specific requirements set forth in the federal laws and regulations.  Accordingly, state courts have no greater competence or expertise than federal courts in interpreting such laws."); *Culbertson v. Coats Am., Inc.*, 913 F. Supp. 1572, 1578 (N.D. Ga. 1995) ("The CWA provides for the enforcement of federal standards through the combined efforts of state agencies, federal agencies, and private citizens. . . . The statutory scheme thus contemplates citizen suits as a *supplement* to state government action."); *Natural Res. Def. Council v. Outboard Marine Corp.*, 692 F. Supp. 801, 810 (N.D. Ill. 1988) ("[S]tate enforcement and administration of water pollution controls are also authorized by the [CWA], but they are governed by specific requirements of federal law.").

Lastly, for the Court to rule in these actions will not disrupt West Virginia's efforts to establish a coherent environmental policy.  As detailed above, Plaintiffs' claims are characterized as citizen enforcement suits under the federal CWA; they are not seeking to collaterally attack the underlying permits.  Further, the issues regarding the validity of the EQB stays were only brought

-30-

before the Court as a defense raised by Defendants.  If the Court determines the EQB stays do not extend to delay the effectiveness of the underlying permits, it will not be crafting new policy with regard to the establishment of effluent limitations or the issuance of water permits.  Rather, the Court will be making a determination based on its interpretation of state and federal statutes.  *Martin*, 499 F.3d at 367 ("[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.") (quoting *Zablocki v. Redhail*, 434 U.S. 374, 379–80 n.5 (1978)).  For the foregoing reasons, the Court **FINDS** that *Burford* abstention does not apply in these cases.

**E.**      **The Doctrine of Primary Jurisdiction Does Not Apply**

Defendants argue that the Court should abstain from exercising its jurisdiction under the doctrine of primary jurisdiction.  "The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties."  *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956).   Where issues "have been placed within the special competence of an administrative body . . . the judicial process is suspended pending referral of such issues to the administrative body for its views."  *Id.* at 64.  "Generally speaking, the doctrine is designed to coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion."  *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996) (citations omitted).

For the Court to rule on these actions does not require the Court to rule on the validity of the underlying permits, or the ability of the EQB to decide whether the WVDEP erred in its denials of the modification requests.  Instead, for the Court to reach the question of whether or not Defendants

are in violation of the selenium effluent limitations, it will review the validity of the EQB's stays within the context of the EQB's statutory authority, within the broader governing federal law framework. This is not an area of fact requiring the regulatory expertise that has been delegated to the State under the CWA. This is an area of law where this Court has expertise—statutory interpretation. The Court is confident in its ability to determine these questions of law. Accordingly, this Court **FINDS** that the doctrine of primary jurisdiction is not applicable in these actions.

**F.**      **The Permits at Issue are Ripe for Review**

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). When a court is determining whether an action is ripe for review, it must determine "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808 (citing *Abbott Labs.*, 538 U.S. at 149). Defendants argue that because the EQB has stayed the underlying permits pending its review of the denials of the modification requests, Plaintiffs' claims that Defendants have violated their permits are not yet ripe for review as further adjudication by the EQB could moot the current actions in front of this Court.

If the EQB stays could halt the effective date of the selenium effluent limitations, the Court agrees these actions would not yet be ripe for review. However, if the effect of the EQB stays do

not extend beyond the modification denial orders, the permits—and the selenium effluent limitations—are valid and operative.  The Court recognizes that Plaintiffs are not challenging an agency action, but instead are pursuing a citizen enforcement suit in federal court.  Accordingly, "Plaintiffs' claims are based solely on defendant's permit violations and on the assumption that defendant's permit and the underlying agency action are valid and operative."  *Domino v. Didion Ethanol, LLC*, 670 F. Supp. 2d 901, 915 (W.D. Wis. 2009).  If the selenium limits are in effect, Plaintiffs' claims would not be hypothetical or speculative, as the only facts necessary to determine the validity of the claims would be drawn from Defendants' discharge monitoring reports.

Further, if the EQB does ultimately find the WVDEP should have granted the modification requests[9], it will not alter the fact that Defendants are liable for any currently ongoing violations at this time.[10]  *See, e.g.*, *Sierra Club v. Franklin Power of Ill.*, 546 F.3d 918, 929 (7th Cir. 2008) (finding a plaintiff does not have "to wait until the relevant agency finishes deciding whether a permit is valid"); *Domino*, 670 F. Supp. 2d at 915 (finding a future "modification would not affect defendant's liability for violations of other permit conditions . . . in effect").  Accordingly, this Court must conclude that the issue of whether the EQB stays of the underlying permits are valid is fit for

----

[9] The Court notes Plaintiffs' additional argument that any modification granted by the EQB and WVDEP at this point would violate the anti-backsliding provisions of the CWA.  As the EQB has yet to rule on the appeals of the denials of the modification requests, the Court finds that this argument is not yet ripe for adjudication.

[10] What are being appealed to the EQB are the denials of the modification requests.  Only upon the request of the defendants did the EQB extend the stays to halt the effect of the selenium effluent limitations contained in the underlying permits.  The Supreme Court of the United States has recognized in the context of the Clean Air Act that where a polluter is seeking a variance, the application "is carried out on the polluter's time, not the public's."  *Train v. Natural Res. Def. Council*, 421 U.S. 60, 92 (1975).  Accordingly, an "offender remains liable for violations while a request is pending."  *Natural Res. Def. Council, Inc. v. Outboard Marine Corp.*, 692 F. Supp. 801, 811 (N.D. Ill. 1988) (citing *Train*, 421 U.S. at 92).

-33-

judicial decision.  Further, for the Court to find otherwise would present a hardship for Plaintiffs, as they would be stripped of a forum for their enforcement suits even though the permits may currently be in effect.  Accordingly, this Court cannot dismiss these actions on the basis of Defendants' ripeness arguments without first ascertaining whether the EQB stays do what they purport to do.  It is to this question—which is the crux of these cases—that the Court now turns.

**G.**     **The Effect of the EQB Stays on the Effective Date of the Selenium Effluent Limitations**

To the Court, the simplest way to frame the key issue in these actions is as follows: Are the selenium effluent limitations in effect, or are they stayed by the EQB orders?  If the former, the Court has jurisdiction over Plaintiffs' claims; if the latter, Plaintiffs' claims are premature as Defendants are not yet in violation of their WV/NPDES permits.  This is a difficult question to answer.  The CWA is a system of cooperative federalism.  There is a balance between a state's authority over its NPDES permitting system, and the ultimately controlling federal laws.  To ascertain whether the stays do, in fact, stay the effectiveness of the selenium limits requires this Court to walk the fine line between deference to the state administrative process and protection of the role of federal law requirements under the CWA, including federal oversight of the state permitting process by the EPA.

Defendants, as the basis for their cross-motions in these cases, argue that the stays issued by the EQB stay the effective date of the selenium effluent limitations.  On the basis of this argument, Defendants assert that Plaintiffs' claims are premature as the limits are not in effect and, therefore, Defendants cannot be in violation of the limits included in the permits.  Plaintiffs contest the validity of the EQB stays.  Specifically, Plaintiffs argue: (1) that federal, and not state, law governs this action and the stays do not affect the viability of the citizen enforcement actions; (2) that the EQB

-34-

stays are modifications of the permits and did not comply with the procedures required for modifications; and (3) that the EQB exceeded its statutory authority by issuing a stay of the underlying permits not before it on appeal.[11]

### 1.    State Law and Federal Law Apply to Plaintiffs' Claims

Plaintiffs assert that because their actions seek to enforce—under federal law—the effluent limitations contained in Defendants' WV/NPDES permits, the state proceedings—solely a matter of state law—do not impact the ability of this Court to adjudicate these cases.  This argument oversimplifies the cooperative federalism structure of the CWA.  The Supreme Court has noted that "the [CWA's] regulations 'effectively *incorporate[d]*' State law into the unitary federal enforcement scheme . . .." *Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 294 (4th Cir. 2001) (quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992)); *see also* 40 C.F.R. 123.25.  The delineation between what falls within the purview of the State and what can be enforced under federal law is not as clear cut as Plaintiffs argue.

Where a state implements its own NPDES permitting system, the state has a significant level of authority.  *See, e.g.*, *Chesapeake Bay Found., Inc. v. Va. State Water Control Bd.*, 495 F. Supp. 1229, 1232 (E.D. Va. 1980) ("The Act, in general, and the NPDES program, in particular, thus join the state and federal governments in a 'delicate partnership' endeavoring to control and eventually eliminate water pollution.  The permitting process under § 402(b) is, for the most part, undeniably

---

[11] In addition, Plaintiffs argue that the stays are not binding on the Court as they are akin to preliminary injunctions.  However, as the Court finds these cases can be decided on other grounds, it declines to reach this argument.  Plaintiffs also argue that any modification granted at this stage would be retroactive and would fail to comply with the EPA review and public notice and comment requirements under federal law.  These issues are not currently before this Court.  If the EQB grants the relief Defendants seek and the modifications of the compliance schedules are granted, at that point these arguments will be ripe for decision.  At this stage, to decide these questions would require the Court to speculate.

a state program." (citations omitted)).  For example, West Virginia has promulgated regulations that specify the various procedures a permit applicant must comply with.  *See* W. Va. Code R. §§ 47-10-1, *et seq.*  Concurrently, citizens can seek enforcement of permit limits in federal court, and the EPA has the authority to review and object to permits issued by the State.  *See* 33 U.S.C. §§ 1365(a), 1342(d); *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 871 (7th Cir. 1989); 40 C.F.R. § 123.44; *MOA* § II-E; W. Va. Code R. § 47-10-3.6.b.  The federal and state authority over the NPDES permitting process do not operate independently of each other, and, at times, a federal court must defer to a state's authority over the implementation of the permitting process.  This principle is reflected in the prohibition against a federal court sitting in review of a state-issued permit.  *See, e.g.*, *Potter v. Asarco, Inc.*, 1999 WL 33537055 (D. Neb. 1999).  Accordingly, the effect of the stays cannot be dismissed merely because selenium effluent limitations are enforceable under federal law.

### 2.    The EQB Stays Are Not Modifications of the WV/NPDES Permits

Plaintiffs forcefully argued during oral argument that because the stays have, in some cases, delayed the effective date of the selenium limitations for approximately a year, the stays are modifications of the permits as the stays fundamentally alter a key component of the permits. Therefore, Plaintiffs assert, as the issuance of the stays did not follow the state or federal procedures required for a permit modification, the stays' purported effect on the selenium effluent limitations is invalid.  The Court disagrees.

To obtain a modification of a permit, as Plaintiffs point out, a specific procedure must be followed, which involves an application by the permittee (or the Director initiating the process on his own), followed by a review process which involves public notice and comment, and review by the EPA.  *See* W. Va. Code R. § 47-10-9.  A modification can only go into effect if it complies with

these requirements and the WVDEP issues a newly modified permit at the end of the process.  A stay, in contrast, is a judicial tool that allows a deciding entity to "temporarily suspend[] the source of authority to act—the order or judgment in question . . . .  A stay 'simply suspend[s] judicial alteration of the status quo' . . . ."  *Nken v. Holder*, 129 S. Ct. 1749, 1758 (2009) (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)).  The orders issued by the EQB with regard to these permits are, without question, no more than stays—they do not purport to rewrite or fundamentally alter the underlying permits, but rather seek at most to postpone the effective dates of the selenium limitations while the Board reviews the denials of the modification requests.  Thus, the orders fall squarely within the definition of a stay.

To find that, because a stay purports to do what the modification request sought, the stay is therefore transformed into a modification of the underlying permit goes too far.  As Defendants point out,  the EQB stays do not reverse the WVDEP's denial of the requests for modification of the permits, and they do not grant a modification of the permits.  Instead, the stays were issued for the reason that stays are used by courts: to give the deciding entity the time to properly decide an issue before it while ensuring the status quo is not altered in an manner that would violate the due process rights of one of the parties.  *See Nken* 129 S. Ct. at 1758.  The fact the EQB stays may have the effect of postponing the effective date of the limitations—the modification Defendants were seeking—does not mean the stays must comply with the modification procedures.  The statutes are clear as to how a permit is modified and those circumstances are not presented in the EQB's issuance of the stays.  Accordingly, the stays cannot be found to be modifications and, therefore, are not subject to those requirements.

### 3. The Stays Exceed the Scope of the EQB's Statutory Authority

Under West Virginia law, where a party is adversely affected by an order issued by the WVDEP or by the agency's failure to act, the party can appeal to the EQB.  W. Va. Code § 22-11-21.  Appeals to the EQB are governed by the provisions found at W. Va. Code § 22B-1-7.  Of particular relevance to this case is subdivision (d), which states in relevant part:

> The filing of the notice of appeal does not stay or suspend the effectiveness or execution of the order, permit or official action appealed from . . . .  If it appears to the appropriate chief, the secretary or the board that an unjust hardship to the appellant will result from the execution or implementation of a chief's or secretary's order, permit or official action pending determination of the appeal, the appropriate chief, the secretary or the board, as the case may be, may grant a stay or suspension of the order, permit or official action and fix its terms: *Provided*, That unjust hardship shall not be grounds for granting a stay or suspension of an order, permit or official action for an order issued pursuant to article three, chapter twenty-two of this code.

It is pursuant to this authority that the EQB granted the stays in the state proceedings regarding the permits at issue in both *Independence* and *Coal-Mac*.

Each party argues for differing interpretations of the scope of the EQB's authority based on the statutory language contained in this provision.  Defendants, in their argument, point to the fact that the legislature opted to use a definite article when referring to "the order . . . appealed from" in the first sentence, but used an indefinite article when referring to "a chief's or secretary's order" in the second sentence.  Based on this differentiation, Defendants assert that the EQB's authority to stay an order is not limited to the order appealed from, but can be applied to *any* order that could result in unjust hardship.  Plaintiffs disagree; reading the provision as a whole, they argue that the phrase "a chief's or secretary's order" "must be read in reference to 'the order, permit or official action which precede and follow it.'"  *Pls.' Resp. Defs.' Supplemental Authority in Supp. Defs.' Cross-Mots. Summ. J. & Resp. Ct.'s Jan. 31, 2011 Order* 6, *Coal-Mac*, Doc. 74.  Otherwise,

Plaintiffs continue, the EQB could stay the effect of any order it so chose so long as the interested party met the criteria of showing an "unjust hardship." *Id.* Instead, Plaintiffs argue that the indefinite article applies to "chief" and "director" because the statutory provision "applies to multiple chiefs and secretaries, and the phrasing of the statute repeatedly preserves this multiplicity . . . ." *Id.* Defendants counter, stating that the indefinite article applies to both "chief" and "director" as well as the nouns that follow, "order, permit or official action."

In statutory interpretation, a court first looks to the plain meaning of the statutory language. *United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010) (citing *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)). However, "the meaning of statutory language, plain or not, depends on context." *Holloway v. United States*, 526 U.S. 1, 7 (1999) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991))); *see also*, *Ide*, 624 F.3d at 668 ("[A court's] analysis of particular statutory language also is informed by 'the specific context in which that language is used, and the broader context of the statute as a whole.'") (quoting *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 530 (4th Cir. 2005) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))) . Accordingly, "[i]n examining a statute's plain meaning, we consider all the words employed and do not review isolated phrases." *Ide*, 624 F.3d at 668 (citing *United States v. Mitchell*, 518 F.3d 230, 233–34 (4th Cir. 2008)).

To adopt the meaning Defendants urge requires this Court to parse the language of the provision, reviewing each sentence independent of the other, thereby ignoring the broader context. The provision in question is a sub-section of a statute entitled "Appeals to boards" that outlines the specific procedures and guidelines for appeals to state environmental administrative boards. Subsection (d) begins by stating that an appeal of "the order, permit or official action appealed from"

does not stay or suspend the effectiveness of the order or permit.  The second sentence of the subsection is most properly read as a "but" or "however" to the first sentence; in those instances where the lack of an automatic stay of the order appealed from would cause "unjust hardship," the board—here the EQB—has the authority to stay the effect of the order in question.  Thus, the scope of the authority to grant a stay outlined in the second sentence is defined by the first sentence, which refers to "the order, permit or official action appealed from."  To reach Defendants' interpretation requires the Court to disregard the context of the subsection, which establishes the procedures and scope of authority of the boards, including the EQB, during the appeal process.  The plain meaning of the statute is without question colored by the fact that it has to do with orders and permits *on appeal*.  This interpretation finds support in the EQB's own rule implementing the statute, which states "[t]he appellant may request a stay of the action appealed from by written motion . . . ."  W. Va. Code R. § 46-4-5.5.

This contextual—yet plain meaning—reading of the provision counters another argument by Defendants.  They assert that Plaintiffs' reading of the provision renders the two usages of the indefinite article in the second sentence of the provision ("a chief's or secretary's order" and "an order, permit or official action for an order issued pursuant to article three . . .") superfluous.  The Court disagrees.  Plaintiffs' reading does not render the indefinite articles meaningless.  The first indefinite article in the second sentence is most properly read to apply to chief and secretary, rather than "order, permit or official action."  This provision does not just apply to the WVDEP and the EQB, but applies to all environmental administrative agencies and their associated appeal boards.  Thus, the use of an indefinite article to refer to the multitude of chiefs and secretaries does not render the indefinite article superfluous.  If the second indefinite article referring to orders issued under

-40-

article three, chapter twenty-two of the code were changed to a definite article, it would make no sense.  An indefinite article was used in this instance because it refers to a hypothetical order on appeal issued under the relevant chapter of the code; clearly, not all appeals will involve such an order.

Further, the Court finds that Defendants' interpretation would render the language in the second sentence superfluous, which allows a stay in the case of an unjust hardship "pending determination of the appeal."  If, as Defendants urge, the Court reads this provision to allow the EQB to stay the effect of *an* order, permit or official action, rather than *the* order appealed from "pending determination of the appeal" the time limitation provided in this sentence would have no substantive meaning.  The effect of the stay would end when the appeal ended, even if the appeal had nothing to do with the order stayed by the EQB.  Following Defendants' reasoning to its logical conclusion, whenever the EQB entertains an appeal, a permittee can use the opportunity to request a stay of any order it so chooses that the permittee finds bothersome and that the EQB finds satisfies the unjust hardship threshold.[12]  The difficulty presented by Defendants' interpretation of this provision is illustrated by what has occurred in front of the EQB with regard to the permits at issue in these actions.

Defendants in *Coal-Mac* have vigorously argued that the statutory mechanism that governs the process for EPA objections to state-issued NPDES permits can place a permittee in legal limbo, and has in this case.  Under this mechanism, "any interested person may request that a public hearing

---

[12] Defendants argue that the provision does limit the EQB's stay authority, pointing to the prohibition against unjust hardship as grounds for a stay in the case of a permit or official action for an order under article three, chapter twenty-two of this code.  The Court does not find this persuasive.  The mere presence of this limitation does not mean another limitation can be read out of the provision.

be held . . . on the objection."  40 C.F.R. § 123.44(e).  Defendants assert that these hearings are not

a meaningful review as they are limited in scope, and do not address the merits of the EPA's

objection.  *See Defs.' Mem. Supp. Mot. for Leave to File Supplemental Authority* 3, *Coal-Mac*, Doc.

69.  Moreover, at the close of the "appeal" process, the EPA is only required to withdraw, reaffirm,

or modify the objection; there is no obligation that if the EPA maintains its objection, it must make

a final decision to issue or deny the permit.  40 C.F.R. § 123.44(g).  Only a final action, defined as

"a final decision to issue, deny, modify, revoke and reissue, or terminate a permit," is reviewable

by the Environmental Appeals Board.  Thus, Defendants argue, if the EPA fails to make a final

decision, they are stuck in legal limbo.

    Defendants assert they are not seeking an alternative process to the federally created

"appeal" process, and that they proffered this argument "only to explain the decision to pursue their

extension requests before the EQB versus EPA."[13]  *Defs.' Reply in Supp. Mot. to Supplement &*

*Resp. to Ct.'s Jan. 31, 2011 Order* 4, *Coal-Mac*, Doc. 75.  Yet, the implementation of their

expansive reading of EQB's stay authority has resulted in a situation where the state administrative

review process has rendered the EPA review of the State-issued permits—a federal law

requirement—meaningless.  The stays and, now, a placement of Defendants' appeals on the EQB's

inactive docket, have resulted in a de facto extension of the compliance schedule in contravention

---

    [13] Defendants' argument is speculative.  Pursuing public hearings on the EPA's objections
could have resulted in decisions favorable to Defendants.  Arguing that *if* the EPA did not make a
final decision Defendants *could* be stuck in legal limbo is not sufficient grounds to circumvent this
statutorily created avenue of appeal by pursuing state-only relief.  Furthermore, Defendants could
have simultaneously pursued their present course of action in front of the EQB and the public
hearings under 40 C.F.R. § 123.44(e).

of the EPA objections.  As a result of the stays, Defendants have not had to comply with the selenium effluent limitations for almost a year after their effective date, April 5, 2010.[14]

Defendants are looking at the cooperative federalism structure of a state-run NPDES permitting process backwards.  A state has the primary authority in decisions regarding the issuance of permits *subject to review by the EPA*.  The public hearing process is the statutory mechanism that was created to govern the relationship between a state and the EPA when the EPA issues an objection to a permit.  *See, e.g.*, 33 U.S.C. § 1342(d)(4); *Champion Int'l Corp. v. EPA*, 850 F.2d 182, 187 n.12 (4th Cir. 1988) (characterizing the request for a public hearing as the procedure for appeal of EPA objections); *MOA* § II-I.  If a permittee can utilize the state administrative process to render the effect of this objection process meaningless by seeking a stay from an administrative review board, rather than seeking the public hearing provided for under the federal CWA, it is in clear contravention of federal law and contrary to what Congress intended.[15]

For the foregoing reasons, the Court **FINDS** that the EQB exceeded its statutory authority when it issued a stay of both the orders before it on appeal and the underlying permits, which were

---

[14] Or more than a year for those permits whose compliance dates went into effect prior to April 5, 2010.

[15] Further, Defendants could have appealed the compliance schedules when they were first established in the various permits, Orders, and Amended Orders at issue in these actions, or pursued their modification requests early enough to seek timely redress if the requests were denied.  While Defendants may not like the timing of the administrative review process and for the EPA objections, this is the regulatory system in place.  *See, e.g.*, 33 U.S.C. § 1342(d)(4); *Champion*, 850 F.2d at 187 n.12.  The Court also observes that in some instances Defendants appeared to make little effort to comply, failing to construct selenium treatment facilities as required under the WVDEP orders.  For instance, the WVDEP, in denying Defendant Independence's request for a modification of WV/NPDES Permit WV1017152, found a lack of "good cause" as the company failed to take action to comply with the selenium effluent limitations.  Accordingly, Defendants' present situation is partly of their own creation.

not the subject of an appeal.  Accordingly, the underlying permits and the effective dates of the selenium effluent limitations are currently operative.

**H.**     **Plaintiffs Have Satisfied the Requirements for a Citizen Suit Under the CWA and the SMCRA**

Having determined that the Court has jurisdiction over Plaintiffs' claims and that the stays do not extend to the selenium effluent limitations in the underlying permits, the Court now turns to the issue of whether Plaintiffs have satisfied the requirements to achieve relief under a citizen suit filed pursuant to the CWA or SMCRA.

**1.      Plaintiffs Complied with the Sixty-Day Notice Provisions**

Under the CWA and the SMCRA, no citizen suit may be commenced prior to the provision of sixty-days notice to the alleged violator, the Administrator of the EPA or Secretary of the Department of Interior, and the state in which the alleged violation occurred.  33 U.S.C. § 1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A); *see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 391 (4th Cir. 2011).  The notice

> shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a); *see also* 30 C.F.R. § 700.13(e).  Providing such notice "is a mandatory condition precedent to filing suit under the [CWA]."  *Gaston Copper*, 629 F.3d at 399 (citing *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989)).  "Without adequate notice, the Court does not have subject matter jurisdiction to hear the case."  *Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 437 (D. Md. 2010) (citation omitted).  The purpose of the notice is to "allow a potential defendant to identify its own violations and bring itself into compliance

voluntarily," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d

481, 488 (2d Cir. 2001) (citations omitted), and to "allow[] Government agencies the opportunity

to take responsibility to enforce the environmental regulations" *Assateague Coastkeeper*, 727 F.

Supp. 2d at 437 (citing *Hallstrom*, 493 U.S. at 29).  Accordingly,

> as long as a notice letter is reasonably specific as to the nature and time of the
> alleged violations, the plaintiff has fulfilled the notice requirement.  The letter does
> not need to describe every detail of every violation; it need only provide enough
> information that the defendant can identify and correct the problem.

*San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002).  "The

sufficiency of the plaintiffs' notice letter must be assessed based on the facts that existed" at the time

notice was provided.  *Gaston Copper*, 629 F.3d at 401.

Plaintiffs sent their sixty-days notice letter to Defendants in both actions on April 14, 2010.

*See* Docs. 5-2 & 26-12, *Coal-Mac*; Docs. 17-3 & 17-4, *Independence*.  Defendants in *Coal-Mac*

challenge the sufficiency of the notice with regard to Coal-Mac's WV/NPDES Permit 0068764 and

Mingo Logan's WV/NPDES Permit 1004956.  Defendants mostly rely on the assertion that, as the

selenium effluent limits were stayed at the time Plaintiffs sent their sixty-days notices, there were

no ongoing violations when Plaintiffs provided notice.   Therefore, Defendants argue, Plaintiffs

listed violations of standards that were not yet in effect at the time the letters were sent.  However,

this Court has already decided, *supra*, the stays do not extend to the selenium effluent limitations.

Accordingly, the selenium effluent limitations were in effect on April 14, 2010 when Plaintiffs sent

their notice letters to Defendants.

Defendants also argue that even if the limits were in effect as of April 5, 2010, Plaintiffs'

notices allege no violations of the limitations after that date.  Defendants claim that, as the notice

of intent letters are based on discharge monitoring reports ("DMRs") dated prior to April 2010,

Plaintiffs did not allege any violations of the selenium effluent limitations *after* that standard went into effect on April 5, 2010.  A review of the notice of intent letters quickly dispenses with this argument.  Plaintiffs based their allegations on the DMRs submitted by Defendants to the WVDEP dating from January 1, 2008 through December 31, 2009.  The DMRs established that if the selenium effluent limitations had been in effect, Defendants would have been in violation during that time period.  In light of "the absence of any evidence that [Defendants] ha[ve] taken any meaningful efforts to eradicate its selenium discharges from those outfalls," Plaintiffs inferred that Defendants were in violation on the date of their notices of the then effective selenium effluent limitations.[16] *60-Day Notice of Intent to Mingo Logan* 20, Doc. 26-12; *60-Day Notice of Intent to Coal-Mac* 6–7, Doc. 5-2.

While the DMRs reported discharges prior to April 5, 2010, the information contained in Plaintiffs' notice of intent letters was sufficient to allow Defendants to ascertain and potentially address the alleged violations.  The notice of intent letters informed Defendants of alleged violations of the selenium effluent limitations contained in specific WV/NPDES permits, of the outfalls implicated by the allegations, and of the date of alleged violations.[17]  This was "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated . . . ."  40 C.F.R. § 135.3(a).  The Court therefore **FINDS** that Plaintiffs' sixty-days notice of intent to sue letters complied with the requirements of 40 C.F.R. § 135.3(a) and 30 C.F.R. § 700.13(e).

---

[16] With regard to Mingo Logan's WV/NPDES Permit WV 1004956, Plaintiffs now assert that the selenium effluent limitations have been in effect since March 29, 2008 as WVDEP re-issued this permit on August 14, 2007—after the issuance of the Amended Order No. 45.  *Am. Compl.* ¶ 68, Doc. 57.

[17] April 5, 2010 through the date of the notice of intent letter, April 14, 2010.

2.      **Plaintiffs Have Established Defendants are in Continuing Violation of the CWA and the SMCRA**

As detailed above, a citizen suit under the CWA may be commenced "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a).  Likewise, under SMCRA, a citizen may commence a citizen suit "against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to [SMCRA]."[18]  30 U.S.C. § 1270(a)(1).  The Supreme Court of the United States expounded on the "alleged to be in violation" requirement, finding that this requirement is satisfied and a federal district court has jurisdiction "when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation."  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987).  To succeed in a citizen suit, the citizen plaintiff must prove an ongoing violation, which may be accomplished "either: (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."  *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171–72 (4th Cir. 1988) ("*Gwaltney II*").

Plaintiffs in *Coal-Mac* have moved for summary judgment on their claims related to WV/NPDES Permits WV1003763, WV0068764, and WV1004956.  Plaintiffs in *Independence* have moved for partial summary judgment on all claims in the case, but did not include Outfall 023 of Independence's WV1017152 permit; Outfall 014 of Jacks Branch's WV0093912 permit; and Outfall

---

[18] Defendants moved for summary judgment on the SMCRA claims as they were derivative of Plaintiffs' CWA claims, which, Defendants argued, were precluded by the EQB stays.  As the Court has found the CWA claims can move forward, so to can the SMCRA claims.  This argument was also advanced with regard to Plaintiffs' claims that Defendants' violated the Orders and Amended Orders associated with the permits; it likewise fails.

004 of Independence's WV1016890 permit.  Defendants do not contest the assertions that Plaintiffs have satisfied the *Gwaltney II* test on the basis of Defendants' DMRs dating from December 2008 with regard to Permit WV1003763 issued to Coal-Mac, and dating from April 1, 2010 through June 30, 2010 with regard to all remaining permits.  *See Pls.' Mem.* 9–12, *Coal-Mac*, Doc. 6; *Pls.' 2d Mem.* 15–19, *Coal-Mac*, Doc. 30; *Pls.' Mem.* 15–19, *Independence*, Doc. 21.  The Court **FINDS** that Plaintiffs have satisfied the evidentiary burden to establish "continuous or intermittent violations" by the defendants.  Further, the Court **FINDS** that there is no material issue of fact with regard to the issue of whether Defendants violated the requirement to construct and install selenium treatment facilities contained in the various WVDEP Orders and Amended Orders associated with the permits. Accordingly, Plaintiffs are **GRANTED** summary judgment on their First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Claims for Relief in *Coal-Mac*.  They are also **GRANTED** summary judgment on their First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Claims for Relief in *Independence*, except insofar as those claims address Outfall 023 of Independence's WV1017152 permit; Outfall 014 of Jacks Branch's WV0093912 permit; and Outfall 004 of Independence's WV1016890 permit, as they are not the subject of a summary judgment motion.

I.     **The Effect of this Opinion is Stayed with Respect to WV/NPDES 1003763**

The Consent Decree entered into by Defendant Coal-Mac and the EPA establishes a Selenium Compliance Plan with regard to Coal-Mac's WV/NPDES Permit 1003763, Outfall 002. The Consent Decree is currently before the court in Civil Action No. 2:11-cv-0133, and will only become final if and when the court approves it.  As the Court finds that the Consent Decree most likely moots Plaintiffs' claims with respect to this permit, it **STAYS** the effect of this Opinion on

WV/NPDES Permit 1003763.  When a decision is reached on the Consent Decree, the parties are **DIRECTED** to inform the Court of its final disposition, at which point the Court will determine whether Plaintiffs' claims with regard to Coal-Mac's WV/NPDES Permit 1003763 should be dismissed on mootness or *res judicata* grounds.

**J.**     **Plaintiffs Are Entitled to Permanent Injunctive Relief and Civil Penalties**

To obtain a permanent injunction, a plaintiff must demonstrate the following:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Christopher Phelps & Asocs., LLC. v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007).

Here Plaintiffs have made the requisite showing that they are entitled to injunctive relief. Defendants have been in frequent violation of the selenium effluent limitations contained in their permits since April 2010 (and December 2008 with respect to WV/NPDES 1003763), causing irreparable injury to Plaintiffs.  Although monetary penalties are sought, much of the harm to the environment is already taking place; legal penalties are inadequate to compensate Plaintiffs for their injury.  *See Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.").  In cases concerning environmental damage "the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Id.* This case is no exception.  Finally, the public will be served by the protection of aquatic resources, as intended by the goals and purposes of the CWA and the SMCRA.  Accordingly, the Court **FINDS** Plaintiffs are entitled to permanent injunctive relief.

Under the CWA, "[a]ny person who violates . . . any permit condition or limitation implementing any of such sections in a permit issued . . . by a State . . . shall be subject to a civil penalty . . . ." 33 U.S.C. § 1319(d); *see also Stoddard v. W. Carolina Reg'l Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986) (finding that "[t]his language leaves little doubt that . . a penalty in some form is mandated" as "[l]iability under the Clean Water Act is a form of strict liability."). As the Court has found that Defendants have violated the selenium effluent limitations contained within their permits, the Court **FINDS** a civil penalty must be assessed against the defendants.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motions for partial summary judgment in both actions are **GRANTED** and Defendants' motions for partial summary judgment in both actions are **DENIED**. In order to ascertain the scope of injunctive relief and the amount of civil penalties to be assessed, a hearing must be scheduled on these issues. The Court **DIRECTS** the parties to confer and then contact the Court with their proposed hearing schedules by **April 15, 2011**. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        March 31, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE